Frank ARENA, Plaintiff, Appellant,

v.

**LUCKENBACH STEAMSHIP COM-
PANY, Inc., et al., Defendants,
Appellees.**

**No. 5601.**

United States Court of Appeals
First Circuit.

May 11, 1960.

Rehearing Denied June 10, 1960.

George P. Donovan, East Boston,
Mass., for appellant.

Leo F. Glynn, Boston, Mass., for Luck-
enbach S. S. Co., Inc., appellee.

Before WOODBURY, Chief Judge, and
HARTIGAN and ALDRICH, Circuit
Judges.

ALDRICH, Circuit Judge.

This is an action brought by a
longshoreman injured in the port of Bos-
ton while engaged in loading a vessel
owned by the defendant. The loading
operations were in the sole control of a
stevedoring company, plaintiff's employ-
er.[1] The plaintiff was injured when a
loading board tipped and spilled rolls of
paper into the hold. The complaint al-
leges negligence in the failure to supply
a safe place to work and in supplying
defective loading equipment. It also al-
leges unseaworthiness, again, the alleged-
ly defective loading equipment. At the
close of plaintiff's case the court directed

---

1. This company was named as a third par-
ty defendant, but did not participate in
the appeal, and is not referred to in this
opinion as a defendant.

a verdict for the defendant. The plaintiff appeals.

There was no conflict in the testimony. On the morning in question the vessel was simultaneously loading and unloading cargo. The plaintiff was at the bottom of one of the number 2 hatch "tanks." The hatch was serviced by two winches. The after winch was engaged in discharging canned goods, and the forward one in loading rolls of printing paper. The cargo in each instance was carried on boards. The boards for paper were 5' wide and 8' long, suspended from two slings, or lanyards, fastened on the sides at points somewhat in from the corners. The can boards were suspended from the ends. We will call these boards, for want of a better term, side-boards and end-boards, respectively. Although the record is not altogether clear, apparently for as long as any witness could remember it was customary in the port of Boston to use side-boards for loading rolls of paper of this type, and end-boards for various other purposes. There was no evidence of any previous failure. These particular rolls were about 2½ in diameter and 5' long. Five rolls, as was "the usual custom in the port of Boston," were placed upon a board—a layer of three, and on top of that, a layer of two. Nets permanently attached to each end of the board served, when tied across one to the other, to keep the rolls from rolling off. Longitudinal slippage of the rolls was contained by the sling, or lanyards, from which the board was suspended on each side.

The loading equipment of the vessel consisted of a fixed derrick, or pole, from which two booms were suspended, one stationed inshore, and the other "offshore," over the hatch. There was a winch, with a separate control for each boom. Movement of the cargo from shore to ship was effected by taking up on the offshore falls and slackening on the inshore. The winch was electric, with three speeds each way. Prior to the accident some thirty loads had been brought aboard without incident. Three longshoremen who were on deck at the time [2] testified about the one in question. The first said that as the board came aboard, "it looked like as if it was tipped a little." The second said it was "swinging a little." According to this witness, the winchman "steadied the load on deck to take the swing out of the load. When he had it steadied he started down the hold again. He steadied it again over the hatch and then the load tipped up." All of the rolls rolled out. There was no evidence that any equipment failed, and no one testified, hypothetically or otherwise, as to what caused the upset.

The defendant having had nothing to do with the loading of the vessel, liability depends upon proof of defective or improper equipment. The only testimony as to the winch came from the third witness, the winchman. He stated that "it was beautiful." He added that it ran "a little faster than usual." When asked what he meant by this he said he was referring to high speed only. He did not characterize this speed as excessive, but repeated that the winch was "beautiful." Even if this speed could be thought to be a defect, the witness was not asked, and there was no testimony from which it could be gathered, what speed or speeds the winch had been operated in with respect to this particular load. For all that appears, high speed was used only when the board was light. Nor was there any suggestion that it was unusual for a load to swing a little or tip a little, or that the rate of speed, in high or otherwise, had been the cause of such movement. Although the burden upon a longshoreman to establish causation is not heavy, there must be some evidence that whatever might be claimed to be a defect in the vessel had some connection with the occurrence. The defendant, on this record, could not be charged simply because high speed on this winch was faster than on some others.

2. No witness was called who had loaded the board, or who had seen it being loaded.

The plaintiff bases his attack principally upon the board.[3] There was no evidence that this particular board was damaged or defective. Nor were its lanyards or nets. The board, with its appurtenances, continued to be used for further loading. Apparently, not even any net lines had been injured. Although no witness testified directly what caused the accident to occur, we believe it can be deduced. When the winchman was asked whether he observed anything about the load as it was coming in, he stated, "This was one thing I noticed. The net. They had three bales on the bottom and two on the top * * * This net here had three rolls on the bottom; for two nothing was on them to hold them * * * and these two bales on top they shifted on me * * * The board went up straight and down like that." In other words, with no fastening over the top rolls, and the nets partly filling the spaces between the bottom rolls which would normally help retain them, the top rolls were free to shift, which would further unbalance the board, and accentuate the movement with the eventual result. In view of the fact that even the bottom layer of rolls came out and the nets were not found to be injured after the accident, it may well be that the nets had not been tied at all, but were simply held over the bottom rolls by the weight of the top ones until their shifting released the tension. In any event, the improper loading was not chargeable to the defendant.[4]

■ The plaintiff's contention, which is purely counsel's suggestion, as no witness so testified, is that so-called end-boards would have prevented this accident, and that the vessel was accordingly unseawoi thy. There are two answers to this. In the first place, if the lanyards had been at the ends instead of at the sides of the board, there would have been no protection against end-wise slipping of the rolls. The nets were there to guard against roll-offs. The board was not defective simply because the longshoremen who loaded it neglected to do so in the proper fashion. Secondly, even if it could be found that end-boards rather than side-boards should have been used, the choice of side-boards was the stevedore's. There was no evidence of unavailability of end-boards. If anything, the record suggests the contrary. A vessel is not unseaworthy simply because the improper type of equipment was used by someone unless, also, it appears that the proper type was unavailable. In the ice cream case, of which plaintiff makes much, the waiter's use of a knife was forced upon him by the absence of the proper tool. Ferguson v. Moore-McCormack Lines, 1956, 352 U.S. 521, 522, 77 S.Ct. 457, 1 L.Ed.2d 511.

■ Before concluding, we wish to speak of the pleadings. Except for an admission that the defendant was a foreign corporation doing business in Massachusetts, and an allegation of lack of knowledge as to the citizenship of the plaintiff, the defendant's answer denied every allegation in the complaint. F.R. Civ.P. 11, 28 U.S.C.A. provides in part, "The signature of an attorney constitutes a certificate by him that he has read the pleading; [and] that to the best of his knowledge * * * and belief there is good ground to support it. * * * For a wilful violation of this rule an attorney may be subjected to an appropriate disciplinary action." It is diffi-

---

3. Boards are stevedore's property. We assume, without deciding, that the obligation of seaworthiness applies to equipment such as this, if used for performing a regular ship's function, even though not customarily ship's property. Cf. Considine v. Black Diamond S.S. Corp., D.C.D.Mass.1958, 163 F.Supp. 107.

4. In his brief plaintiff states that the nets were only 2 feet long. There is no testimony from anyone as to the length of the nets. A photograph in evidence demonstrates them to be approximately 5 feet long, even when not stretched taut. We could not say that they could not go to the top of the top layer. There was no direct testimony that they could, or could not, but the fact that the winchman spoke of noticing that the nets were only over the bottom rolls and that the top rolls were free indicates that this was not customary.

cult to believe that counsel who signed this answer had good grounds to assert, among other things, that his client did not either own, operate or manage the vessel, that the plaintiff was not employed by the stevedore, and that he was not injured, or even aboard the vessel. It is a breach of counsel's obligation to the court to file an answer creating issues that counsel does not affirmatively believe have a basis.

Judgment will enter affirming the judgment of the District Court.

### On Petition for Rehearing.

Plaintiff has filed a petition for rehearing, citing the case of Rich v. Ellerman & Bucknall S.S. Co., Ltd., decided by the Court of Appeals for the Second Circuit a day after the instant case, 278 F.2d 704. In Rich the stevedores loading the ship left some of the stow a "dangerous working platform" in the hold, which gave way when the plaintiff longshoreman stepped on it. The decision that a portion of the ship may be made unseaworthy by an act of a stevedore presents no novel principle. Grillea v. United States, 2 Cir., 1956, 232 F.2d 919. It is quite another step to say, as plaintiff does, that because a stevedore may have made negligent use, or negligent choice,* of equipment in which it is bringing freight aboard, the ship becomes unseaworthy. The possible transitory nature of a condition of unseaworthiness has been accented since our opinion herein. Mitchell v. Trawler Racer, Inc., 1960, 80 S.Ct. 926. But we do not believe that unseaworthiness is to be equated with mere negligent conduct. Cf. Blankenship v. Ellerman's Wilson Line New York, Inc., 4 Cir., 1959, 265 F.2d 455 (a case considerably stronger for the seaman.) If a winchman employed by a stevedore negligently lowered a boom onto a longshoreman, it would be true, in a sense, that the long-

shoreman had not been working in a safe place. But absent a showing that the winchman was an unfit individual we could not say that the vessel was unseaworthy.

The petition for rehearing is denied.

---

* While we held that the jury might have found that the rolls were inadequately made fast to the board, the statement in our opinion about negligent choice of a wrong type of board was cumulative, only. Our primary holding as to that aspect of the case was that there was no evidence warranting a finding that it was the wrong type of board.