James **SULLIVAN**, Libelant,

v.

**UNITED STATES** of America, Respondent,

v.

**IMPARATO STEVEDORING CORPORA-TION**, Respondent-Impleaded.

United States District Court
S. D. New York.

Dec. 7, 1961.

Noah Lichtenberg, West New York, N. J., for libelant, Standard, Weisberg, Harolds & Malament, Louis R. Harolds, and Alan H. Buchsbaum, New York City, of counsel.

Robert N. Morgenthau, U. S. Atty., New York City, for respondent, Louis E. Greco, and G. M. Bates, New York City, of counsel.

Hanlon & Dawe, New York City, for respondent-impleaded, Monica & Feury, Joseph P. Feury, New York City, of counsel.

HERLANDS, District Judge.

By libel filed November 8, 1957, libelant alleged that on December 26, 1956 he was an employee of the Imparato Stevedoring Corporation and was injured while engaged in loading operations aboard the USNS BLUE JACKET, a vessel owned and operated by the United States Government. Libelant further alleged that said injuries were due to the unseaworthiness of the vessel, its appliances and appurtenances and to the negligence of the United States, its agents, servants and employees.

In its answer the United States denied negligence and unseaworthiness and alleged in its defense that any injuries received by libelant were due to (1) his contributory negligence, (2) risks which he had assumed and (3) negligence of persons other than respondent.

By petition filed August 4, 1959, the United States impleaded the Imparato Stevedoring Corporation, alleging that if the acts of negligence and improper conditions alleged in the libel did occur or exist they were created and permitted to exist by failure of the respondent-impleaded to perform its contractual duties. Respondent alleges that it is entitled to reimbursement if it is held liable in this action.

## FINDINGS OF FACT

1. On December 26, 1956, the USNS BLUE JACKET was a public vessel of the United States, operated by the Military Sea Transportation Service of the United States Navy.

2. On that date the vessel was moored, starboard side to, at Pier No. N-6, U. S. Naval Supply Depot, Bayonne, New Jersey.

3. By contract dated July 2, 1956, the respondent had contracted with Imparato Stevedoring Corporation, an independent contractor, to perform stevedoring services in connection with the loading of cargo aboard said vessel.

4. During the morning of December 26, 1956, the respondent-impleaded was engaged in loading frozen boneless beef aboard said vessel.

5. The frozen beef was encased in cartons which were loaded by means of palletized drafts.

6. The frozen beef cartons were initially unloaded by Government Civil Service employees from railroad box cars located on the opposite side of the pier from the vessel, near Building 35 reefer house.

7. The Government employees stacked the cartons on 4 foot by 6 foot wooden pallets owned by the Navy.

8. Each carton weighed about 55 pounds and measured 20½ inches by 15½ inches by 5½ inches, and some of the cartons were bellied and frost covered.

9. Fifty-two cartons were stacked on each pallet in three layers. The first two layers stood on edge and were bulkheaded or bonded, which is the practice of cross-ribbing or turning the boxes as exhibited in Respondent's Exh. S (2–7). The top layer was stacked on its broadest base. The height of the draft was approximately three feet.

*Discussion*

The parties agree that the pallet in question carried three layers of cartons, the first two standing on edge and the third lying flat. The disputed issue is whether or not a fourth layer was present.

William Ahern testified to the presence of the fourth layer (833), stating that he observed the loaded pallet on the deck after the accident (832, 833). The accuracy of Ahern's recollection is in effect challenged by the testimony of Padzunas, the winchman, that after the accident the pallet and draft went into the inshore tank and was unloaded. Padzunas testified that the pallet with the remainder of the cargo was not brought back up to the deck (1142).

William Nesgood, Marine Terminal Superintendent of the Freight Terminal Department at the Bayonne Naval Base, and Leon Genaurio, an employee of the Freight Terminal Division at the Naval Base, both testified that pallets were never loaded with two flat layers above the two layers which lie on edge (943, 1045, 1046).

10. The pattern utilized by the Government for the stacking of cartons was a reasonably safe one.

*Discussion*

Captain William P. Lewis, testifying as an expert on behalf of libelant, characterized the Government's method of stacking the cartons as incorrect, stupid and dangerous (686, 690), in that greater stability would be obtained by stowing a carton on its broadest base even if it was bellied (687).

Paul J. Keeler, testifying as an expert on behalf of respondent-impleaded, testified to the safety of the Government's pattern. Keeler pointed out on cross-examination that the Government's method of loading is, in itself, a safety precaution which was recommended in a United States Navy study (1351, 1353). Keeler indicated that the Government's method of stacking the cartons results in a tying-in of the cases in brick fashion (1351) and provides a level floor which makes the succeeding tiers stable (1434). Keeler stated that, if the tiers were placed on their broadest base, the cargo would lack stability (1435).

The Court accepts the testimony of Keeler on this issue.

11. After being so stacked with the beef cartons, the pallets were moved by the Government employees by means of mobile fork-lift vehicles to a resting area located approximately 50 to 100 feet from the vessel.

12. Employees of the respondent-impleaded then moved the pallets to the dockside in the stringpiece area near the ship's No. 4 hold, into which the boneless beef was being loaded.

13. The longshoremen of respondent-impleaded then placed each pallet into a pallet-bridle in order to load it aboard the vessel.

14. Before the loaded pallets were hoisted from dockside, they were checked by stringpiece men, employees of respondent-impleaded, for proper and safe alignment and positioning.

15. The bridle sling, owned and supplied by respondent-impleaded, was attached to the ship's boom gear for the loading operation.

16. The bridle consisted of two metal bars, each end of which was attached to cables leading to ring eyelets, with netting stretched between the cables, in an area beginning 1 foot 5 inches above the

metal bars and ending 4 feet 5 inches above the metal bars, 2 feet 10 inches below the spreader bars. The square block netting was made of rope, approximately one-half inch thick.

The bridle had the following approximate dimensions: length of metal bars— 4 feet 6 inches; distance from the metal bar to the bottom of the net—1 foot 5 inches; the height of the net—3 feet; distance from the metal bar to the top of the net 4 feet 5 inches; entire length of bridle from the metal bar to the ring eyelet—10 feet 8 inches; distance from the spreader bar to the ring eyelet—3 feet 5 inches; length of the spreader bar —4 feet 6 inches.

*Discussion*

The Court has accepted Nesgood's testimony (962–966) as to the dimensions of the bridle, with the exception of his statement, concurred in by Padzunas, that the nets went right up to the spreader bar.

Sullivan, Ahern and Mink testified that the net itself measured 3 feet in height and did not go up to the spreader bar (106, 737, 848); and the Court so finds.

17. In order to hoist the pallet, the bridle bars were placed between the end wings of the pallet, which were indented recesses of about 5 inches on each 4-foot side.

18. When the bridle is so attached, its netting is primarily on the 4-foot side of the pallet, covering only a small portion of the 6-foot side.

19. As the bridle was raised, its netting and four metal wires tightened and compressed the second and third layers of cartons.

20. The two-ring eyelets of the bridle were secured together by a metal shackle, which was used to attach the bridle to the ship's hook.

21. On December 26, 1956, at about 11 A.M., libelant, a longshoreman employed by respondent-impleaded, was in the after port deep tank on the offshore side of No. 4 hold. At the time, he was engaged in removing the cartons of frozen beef from the pallets and stowing the cartons.

22. As a draft of the palletized cartons was being lowered into No. 4 hold, three cartons fell. They struck the libelant on the back of the head and shoulders, on the upper back and on the palm of the right hand.

23. These cartons, which fell from the 6-foot side of the pallet, had formed part of the top layer.

24. The cartons fell from the draft after it had been lowered approximately 2 to 10 feet into the hatch.

*Discussion*

Libelant contends that the cartons slipped off the pallet as the draft was coming over the inshore coaming above the main deck; and Walter Mink so testified (865). William Ahern testified that, after libelant was hit, he (Ahern) looked up to see whether any more cartons were coming down, and the draft appeared to him to be even with the coaming (746).

The two winchmen, Stanley Padzunas and Leo Wasielewski, testified that the draft was in the hatch when the cartons fell. Padzunas described the draft as being 2 feet into the hatch (1127). Wasielewski said that it was 10 to 15 feet into the hatch (1158).

Both Ahern and Mink were working in the hatch beside libelant at the time of the accident. Mink's recollection as to the position of the draft is based upon a necessarily quick glance upward as the cartons were falling through the air (864). Ahern did not observe the pallet until after the cartons struck libelant.

25. The draft was intended for the inshore deep tank.

26. At the time of the accident, the libelant, Mink and Ahern were engaged in unloading a draft in the offshore tank.

27. As the draft came over the hatch, both winchmen shouted "heads up" or "clear the hatch" in accordance with normal practice.

*Discussion*

Mink testified that he heard someone from above shout "heads up" or "clear

the hatch" (874, 875). Sullivan, the libelant, testified that he could have heard such a signal before he was hit (168).

Each of the winchmen testified that he signaled ("heads up," "watch below," or "watch your head") before the cartons started to slide (1111, 1161).

Libelant had been instructed by his supervisors to keep an "eye open above" when working in the hold.

Mink, who was standing forward of the pallet on which he was working, heard someone say, "heads up." Yelling "look out," he got out of the way of the falling cartons.

Almost at the moment that Mink shouted "look out," Ahern looked up and saw the three cartons falling. Ahern yelled, "Look out Sully."

28. Upon the entire record, the libelant has failed to establish by the weight of the credible evidence that the loading of palletized cartons of beef by the pallet bridle method, without the use of a tie or whiskey net, is an unsafe practice. On the contrary, the preponderance of the believable evidence shows that the pallet bridle method, without the use of a tie or whiskey net, is reasonably safe; and the court so finds.

Capt. William Lewis testified on direct examination that, in his opinion, there are only three safe methods for carrying cartons of the type herein involved from the stringpiece into the hold of the vessel: (1) the pie plate (527); (2) the pallet bridle with safety net on two sides and a rope tie on the top layer of cartons (528, 529); and (3) the whiskey net (529). In his opinion, it is dangerous to load cartons of frozen beef by the pallet bridle method without a rope tie around the top layer or without a whiskey net— the danger being that the cartons can slide, swing off, or be tipped off (543). Capt. Lewis did agree that the pallet bridle method is satisfactory for general cargo (546).

On cross-examination, Capt. Lewis conceded that, in addition to the methods which he had outlined on direct examination, there are other accepted, proven methods of securing and handling a draft (599); that the use of the pallet bridle method for carrying cartons is a standard, accepted practice in New York (600); and that, in the ports of New York and Baltimore, with which he was familiar, it is used more than any other method (601). He stated, however, that the three methods which he outlined are safer than the other accepted, proven methods (599).

There is evidence that cartons fell from similarly rigged pallets prior to December 26, 1956. Libelant testified that he saw cartons of beef or butter fall three or four times as the drafts were being brought into the hatch (283, 284, 285). Edward M. Etoll testified that, on November 30, 1955, he was hit by a case of butter which fell from a pallet (1060), and that on ten or twenty occasions he has observed cartons falling from pallets which were in mid-air, descending into the hold (1064, 1065). Stanley Padzunas said that he saw cartons of this type fall off pallets dozens of times (1117). William Ahern said they fell at least every week (755).

The testimony of Ahern and Padzunas does not clearly indicate whether the incidents that they observed involved the falling of cartons from mid-air or whether the cartons fell after the pallet had been landed in the hold and the bridles removed.

Walter Mink testified that he saw cartons of frozen meat fall from pallets many times before Sullivan's accident (854) but that they fell when the pallet was down in the bottom of the hold (870). They fell as a result of being jarred when the pallet hit the bottom of the hold (869, 870). The first time that Mink saw cartons fall from overhead was Sullivan's accident (870). Similarly, Leo Wasielewski testified that he saw cartons slide quite a few times (1165) but never saw a carton fall off a pallet in mid-air. He saw cartons fall off pallets after the draft was set down in the hold and the bridles were opened up (1170).

Although the testimony of Mink and Wasielewski does not necessarily contra-

dict that of Etoll with regard to prior incidents, it does raise doubts as to their frequency.

The evidence does, however, establish that prior to the date of libelant's accident there were one or more instances in which cartons of frozen beef or butter fell from a draft which was suspended in mid-air.

These earlier occurrences, while relevant, are in no way determinative on the issue of reasonable safety of the pallet bridle method itself. There are numerous reasons why cartons could fall from a pallet, only one of which reasons is the inadequacy of the method.

Paul J. Keeler's opinion, expressed with reasonable certainty, is that the loading of cargo palletized, as were the cartons herein, by means of a pallet and bridle without the use of a rope tie or whiskey net, is "a safe workmanlike procedure" and one that is "standard, customary and accepted practice in the Port of New York" (1319, 1320). He described it as a method that is "safe, proven," "practically safe and functionally safe." (1354, 1355, 1455–1456). The form of this method evolved out of practical experience and came into practical use since 1930 (1453).

William Nesgood similarly described the particular use of the pallet bridle (982–983) as "a safe operation" (1031).

On the fifth day of trial (April 28, 1961), the Court, in the presence of libelant and counsel, conducted an inspection and view of the relevant areas of the Bayonne Naval Base, Bayonne, New Jersey, the scene of the accident. The Court observed a pallet and bridle similar to those used on December 26, 1956. On the pallet were three tiers of cartons of boneless beef, palletized in a manner which duplicated the manner in which the cartons were palletized on the date of the accident.

The pallet, with its cargo, was hooked up to a bridle; and the draft was hoisted by means of a crane, enabling the Court to observe the appearance of the bridle when its nets were drawn taut. The Court noted that the rope comprising the net appeared to be in good condition.[*] The Court observed further that, as the draft was lifted vertically, it was swung rapidly in a circumferential direction and made to sway from side to side.

This view, in combination with the remainder of the record evidence, leads the Court to conclude that the method used is a reasonably safe one.

29. The evidence fails to establish that the cartons which fell and struck libelant on December 26, 1956 were inadequately secured on the pallet or that the pallet, its bridle and netting were unseaworthy or inadequate for the purpose for which they were intended.

*Discussion*

Walter Mink testified that the net used on the day of the accident was old, sagging and dirty (847, 849). He identified Libelant's Exh. 3 as an accurate picture of the kind or bridle and net that was used (852). Mink stated that, in his opinion, the net used on the day of the accident was a poor one (850).

William Ahern stated that the net used was old (738). He identified the bridle pictured in Libelant's Exh. 3 as being of the "same type" used on the day of the accident (762). By the "same type"

---

[*] It is to be noted that the net actually observed by the Court at the Bayonne Naval Base was 5 feet 10 inches between its bottom rope and top rope, while the net used on the day of the accident was 3 feet between its bottom rope and top rope. However, the bottom tier of rope in the net used was over 1 foot above the surface of the pallet. (See finding of fact "16.") The total height of the cargo of cartons on the particular pallet involved in the accident was 3 feet. (See finding of fact "9.") Furthermore, the netting compressed the second and third layers of cartons on the pallet. (See finding of fact "19.") Consequently, the differential between the net observed at the Bayonne Naval Base and that on the palletized cargo on the day of the accident plays no significant role. Even the smaller net that was used on the day of the accident extended beyond the top layer of cartons.

Ahern meant a bridle with spreaders, a bar, and partial netting (762, 763).

Stanley Padzunas did not remember whether the nets used were new or old (1122). Neither Sullivan nor Wasielewski testified to the condition of the bridles on the date of the accident. Sullivan testified, merely, that libelant's Exhibit 3 was a fair representation of the type of net used on the date of the accident (39). Wasielewski testified that there was nothing special about the particular draft involved in the accident (1170).

Assuming that the net used was old, as testified to by Mink and Ahern, and assuming further that the net sagged, as testified to by Mink, the critical question would be the effect of this condition on the rope's ability to adequately perform its function. The fact that a rope sags or is old does not per se establish its inadequacy. Keeler has indicated that there is sag in the rope of new nets (1402).

Edward M. Etoll, an experienced longshoreman, testified that as rope gets old it stretches (1086) and will not be tight against the cargo. The cargo then is able to slide down the four-foot side of the pallet alongside the first and second tier and out through the open space between the pallet bar (the lowest bar) and the lower horizontal line of the rope (1087).

This testimony, however, was contradicted by respondent's expert, Paul Keeler. Keeler testified that, as ropes are used, they become more limber and tend to sag but they do not stretch (1402). The Court accepts Keeler's testimony on this issue.

When the pallet bridle is attached to a loaded pallet, the four cables which are connected to the two pallet bars rise at a sharper angle than the nets, which must be somewhat flexible in order to encompass the cartons. (See Respondent's Exh. S–2). As illustrated in that exhibit, the nets of the bridle are subject to pressure in more than one direction. Thus, the fact that the nets may initially be limber or sagging would not necessarily or materially prevent them from exerting pressure on the cargo.

Furthermore, the fact that only one witness, Walter Mink, testified specifically to the presence of sag in the nets raises, in the circumstances of this case, substantial doubt as to its severity. It is also noteworthy that Mink, after describing the netting as poor and sagging (849, 850) identified Libelant's Exh. 3 as an accurate picture of the kind of net that was used the day of the accident (852). Keeler, when cross-examined with respect to that exhibit, stated that the nets pictured do not look a bit different from new nets and that in fact, in his opinion, they are new nets (1402). Keeler pointed out that the sag present in the nets pictured was the sag of new nets and did not indicate that the nets were worn (1402).

30. The cartons fell from the pallet as a result of the transitory or momentary negligence of the winchmen, employees of Imparato Stevedoring Corporation, the respondent-impleaded. The negligence consisted in the manner in which they operated the winch and married falls while lowering the particular draft of palletized cargo into the hatch. The two winchmen negligently engaged in an uncoordinated winch movement that caused the loaded pallet to oscillate suddenly. This jiggling or jerking, resulting from the uncoordinated winch movement with the pallet on a slant, caused some of the cartons to fall. This was the proximate cause of the accident.

*Discussion*

Leo Wasielewski, one of the two winchmen, testified that as the draft was descending into the hatch, the up and down man slackened off; the draft "comes down towards a slant," and the cases started to go off (1159, 1163; Respondent's Exh. R). The witness stated that, when "working with two wires," a pallet will "always" come down "with a slant" (1165).

Keeler, the respondent's expert, testified that "if you go in in ordinary manner you cannot get an angle on the pallet" (1367). In Keeler's opinion, expressed "with reasonable certainty" (1303), the fact that the pallet was coming down on a slant, as shown by Exhibit R (1307),

about ten to fifteen feet down into the square of the hatch (1308), i. e., "the fact that the bottom of the pallet was not horizontal hanging on a free hook," "can only indicate that there was an uncoordinated winch movement between the two winchmen who had hold of both of those married falls. A pallet hanging under a hook in a confined space like a hatchsquare going directly down can assume no position other than a horizontal position all the way down to its resting place. If the bottom of that pallet assumed any position other than a horizontal position there was some uncoordinated movement of the hook on top that caused it to pendulate or oscillate" (1309).

Keeler continued: "[W]hen the up and down man lowered away, the Burton man had not given him enough slack to continue his plumbing operation of this tank opening, but had held back or even pulled back with his winch in such a way as to make the draft or the hook oscillate to the inshore side, which would then cause the draft to go in an oscillating fashion, which would bring the bottom of the pallet in this position at one time and in this position at another time (indicating)" (1311–1312).

In Keeler's view, the sliding of the cartons was caused by the uncoordinated movements of the two winchmen (1314, 1325–1326), resulting in "fast stopping and starting motions" (1327). Since the wooden pallet has a ton of weight on it, when it is stopped suddenly, the wooden platform has "a tendency to bow" and to "come back like that (indicating) with a fast stop" (1327). The "uncoordinated winch movement" encompasses the sudden stopping, the starting, the attempted corrective action, "a jerk and a stop"—as distinguished from a free-swinging pendulum motion (1327–1328).

These jerks, the deacceleration and the corrective action would not have taken place "if the winchmen were conducting themselves with the degree of prudence and care that careful winchmen under the same or similar circumstances would observe" (1330).

The average lack of perfect coordination that exists even between two normally competent winchmen would not bring about the kind of uncoordinated, jerky winch movement that caused the sliding of the cartons in this case (1331–1332).

31. The operational negligence of the winchmen of the impleaded respondent did not create or constitute unseaworthiness of the vessel nor render the vessel unseaworthy.

32. When the cartons of frozen beef were delivered by the Government employees to the pier side resting area, the Government relinquished all control of, and performed no further work with respect to, the leading operation, which was handled exclusively by the respondent-impleaded.

33. The method and means utilized in loading the palletized drafts from the pier side resting area to the vessel's hold were determined, controlled and effected by respondent-impleaded.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject-matter of this action. 43 Stat. 1112, 46 U.S.C.A. § 781.

2. The suit is within the admiralty and maritime jurisdiction of the Court.

3. The respondent's vessel, US NS BLUE JACKET, its equipment and appurtenances, were seaworthy in all respects at all material times.

4. The fact that the winchmen of the respondent-impleaded were guilty of operational negligence did not render the said vessel unseaworthy nor did such negligence create an unseaworthy condition.

*Discussion*

A shipowner is liable to a longshoreman, even though employed by an independent stevedoring contractor, if the longshoreman, in consequence of the unseaworthiness of the vessel or its equipment, is injured on board in navigable waters while engaged in work connected with the loading or unloading of the vessel. Seas Shipping Co. Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90

L.Ed. 1099 (1946); Pope & Talbot Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

 The owner of the vessel is not insulated from liability by the fact that the unseaworthy piece of equipment was brought on board by the stevedoring company, an independent contractor, for use in performing its duties. Petterson v. Alaska S. S. Co. Inc., 205 F.2d 478 (9th Cir. 1953), aff'd 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

The improper use of proper gear may, under certain circumstances, give rise to a condition of unseaworthiness. Grillea v. United States, 232 F.2d 919 (2d Cir. 1956); DiSalvo v. Cunard Steamship Co., Ltd., 171 F.Supp. 813 (S.D.N.Y.1959). Liability for a temporary unseaworthy condition is no different from the liability that attaches when the condition is permanent. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S. Ct. 926, 4 L.Ed.2d 941 (1960).

However, mere negligent use of seaworthy equipment does not, in and of itself, make a vessel unseaworthy, Arena v. Luckenbach Steamship Co., Inc., 279 F.2d 186 (1st Cir. 1960), cert. denied 364 U.S. 895, 81 S.Ct. 222, 5 L.Ed.2d 189 (1960); Freitas v. Pacific-Atlantic Steamship Company Inc., 218 F.2d 562 (9th Cir. 1955); Manhat v. United States, 220 F.2d 143 (2d Cir. 1955), cert. denied 349 U.S. 966, 75 S.Ct. 900, 99 L. Ed. 1288 (1955); Berti v. Compagnie de Navigation Cyprien Fabre, 213 F.2d 397 (2d Cir. 1954); Edwards v. Steinns, 207 F.2d 734 (4th Cir. 1953); Hill v. American President Lines, Ltd., 194 F. Supp. 885 (E.D.Va. 1961); see Titus v. The Santorini, 258 F.2d 352 (9th Cir. 1958), even though "there is a moment, however short, during which the ship is unfit and during which her unfitness causes the injury." Grillea v. United States, supra 232 F.2d at 922. The owner is not obligated to furnish an accident-free vessel. Mitchell v. Trawler Racer, Inc., supra.

"It would be futile to try to draw any line between situations in which the defect is only an incident in a continuous operation, and those in which some intermediate step is to be taken as making the ship unseaworthy. Nevertheless, it is necessary to separate the two situations, even though each case must turn on its particular circumstances." Grillea v. United States, supra at 922. Unseaworthiness is not to be equated with mere negligent conduct. Arena v. Luckenbach, supra (on petition for rehearing).

 5. The respondent was not negligent in any respect.

6. The libel should be, and hereby is, dismissed.

7. The impleading petition of the respondent-United States against the impleaded respondent, Imparato Stevedoring Corporation, should be, and hereby is, dismissed.

Settle judgment on appropriate notice.