Louis ANTOINE

v.

**LAKE CHARLES STEVEDORES, INC.,
Lykes Brothers Steamship Company,
Inc. and the Travelers Insurance Company.**

Civ. A. No. 10504.

United States District Court
W. D. Louisiana,
Lake Charles Division.

Dec. 28, 1965.

Graham, Smith & Wise, Lake Charles, La., for plaintiff.

Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., Cavanaugh, Brame, Holt & Woodley, Lake Charles, La., for defendants.

HUNTER, District Judge:

Antoine, a longshoreman employed by Lake Charles Stevedores, was injured while working aboard Lykes' SS JAMES

McKAY. He was one of a gang of longshoremen loading rice on board that vessel on June 11, 1964. He was working in the hold and was pinned against the bulkhead of the ship by a load being lowered by the winch operator, a fellow longshoreman.

Antoine sues Lykes, the shipowner, alleging unseaworthiness. The loading operations had been contracted to the stevedores. There was no defective equipment aboard the vessel. There was no breakdown or functional failure of any equipment. Antoine pegs his unseaworthiness contention on the argument that the stevedores did not use a flagman to inform the winch operator of the whereabouts of the longshoremen below whom the winchman allegedly could not see at a crucial time during the loading operation.

The evidence reveals, and we find:

(1) That the accident happened at a time when the winch operator could clearly see all the men in the hold and at a time when a flagman was not needed.

(2) The place Antoine was working was in fact a safe place to work.

(3) The cause of the accident was the concurrent negligence of Antoine and a fellow employee, the winchman.

█ (4) The burden of proving unseaworthiness of a vessel or negligence on the part of a shipowner, and that such unseaworthiness or negligence was a cause of an injury rests upon libellant (McQuiston v. Freighters and Tankers S.S. Co., 217 F.Supp. 701, E.D.La.1963, affirmed 327 F.2d 746, 5 Cir., 1964). Such proof is lacking here.

(5) This case presents a classic example of a longshoreman being injured in the course and scope of his employment, and having as his exclusive remedy the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. Whatever Antoine's disability was and is, his relief should be sought under that Act.[1]

In the factual context of the instant case there can be no recovery, but related issues are constantly before this Court, and the decisions of the appellate as well as the Supreme Court are not conclusive. We think, therefore, it is appropriate to briefly review the jurisprudence so that attorneys practicing before this Court will have our view as to the present status of the law as it pertains to the so-called "operational negligence" of longshoremen.

█ Under Sieracki a shipowner is liable to an employee of a stevedore for an injury caused by negligence of the shipowner or unseaworthiness of the vessel on which the injured longshoreman is working. To me, the jurisprudence appears to be in irreconcilable conflict in fact situations closely analogous as to what action of a longshoreman creates a hazard which constitutes "unseaworthiness."[2]

District judges must, of course, look to federal appellate and Supreme Court

---

1. Plaintiff here was injured. All doctors agree that there is no residual and that he is able to go back to work. Two of the doctors say that he completely recovered within four to six weeks, while a third believes that he was disabled for sixteen months.

2. Judge Clark, dissenting in Puddu v. Royal Netherlands Steamship Company, 303 F.2d 752 (2nd Cir. 1962) said:

"This is another of the several cases before the court at this term putting in issue the question of a vessel's unseaworthiness as a basis for liability to an injured seaman or longshoreman working upon it. The various panels of the court have been in disagreement on this important issue and, in this writer's view, some have shown an unwillingness to accept the Supreme Court's present conception of unseaworthiness. See, as upholding denial of liability, Pinto v. States Marine Corp., 2 Cir., 296 F.2d 1, 8; Hooper v. Terminal S.S. Co., 2 Cir., 296 F.2d 281; Ezekiel v. Volusia S.S. Co., 2 Cir., 297 F.2d 215; and the present case; and as reversing such a holding below, Van Carpals v. S.S. American Harvester, 2 Cir., Dec. 13, 1961, rehearing denied Jan. 10, 1962, 297 F.2d 9, and Massa v. C. A. Venezuelan Navigacion, 2 Cir., 298 F.2d 239.

decisions as a means of procuring analogies for their own, but since what was actually decided by those courts is not always revealed, it is impossible always to rely on them as precedents. We look to these cases to see what was actually decided as against what might have been said. For example, there are decisions in this circuit consistently using language to the effect that absent any defect in the equipment or the appurtenances of the ship, the ship is not responsible for the negligence of the longshoreman. It is doubtful whether this is, in reality, a true statement of the law, for certainly, if one of the longshoremen breaks a pane of glass in a window on the ship, and the glass falls on the deck and another longshoreman walks on the glass and is injured, then the ship is unseaworthy and is responsible to the longshoreman. (See Judge Hays' concurring opinion in Puddu v. Royal Netherlands S. S. Co., 303 F.2d 752 (2 Cir. 1962).

■■■ The ramifications are endless, but the problem seems to be one of characterization. We all know that a shipowner is liable to an employee of a stevedoring company for an injury caused by unseaworthiness. We also know that the shipowner is not relieved of his responsibility by turning control of the loading or unloading operation to a stevedoring company. We know, too, that longshoremen themselves can render a ship unseaworthy and make a vessel owner liable for injuries to one of them.[3] But, what we do not know is: What action of longshoremen can render a ship unseaworthy within the meaning of that term as set out in general statements of law? There is a hankering for something definite and absolute, but hardly is the ink dry upon one formula before the call of an unsuspected equity, the urge of a new group of facts, makes us blur and blot and qualify, and even erase. In this field, we have no belief in the attainability of a perfect and unchanging legal

formula, but the jurisprudence does furnish us with certain guidelines.

The Supreme Court, in *Morales,*[4] states that a vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit, the method of loading her cargo or the manner of its stowage might be improper. The first important decision on "operating negligence" came from the Second Circuit in Strika v. Netherlands Ministry of Traffic, 1950, 185 F.2d 555, cert. denied 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L. Ed. 1343, where Judge Learned Hand held that the longshoremen's use of two "bridles" instead of one in lifting a "pontoon" was unsuitable for that purpose, and the ship thereby became unseaworthy. Both bridles belonged to the ship; but other bridles were there and available which would have been proper. This was a case where the vessel had all the necessary, proper equipment available, but the longshoremen did not use it. The main thrust of *Strika* centered on its holding that the duty to provide a seaworthy ship applied to longshoremen unloading the ship whether they were standing aboard ship or on the pier. So, it really has not been in the mainstream of the operational negligence cases.

The first mainstream decision on operating negligence was also authored by Judge Learned Hand in Grillea v. United States, 232 F.2d 919 (1956) which permitted the libellant longshoreman to recover even though the unseaworthiness arose through his and a co-employee's own negligence. There, the longshoreman and his fellow employee had placed the wrong hatch cover over the "padeye" and when the libellant stepped upon it, it gave way beneath him. Judge Hand wrote:

"It may appear strange that a longshoreman, who has the status of a seaman, should be allowed to re-

3. Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

4. Morales v. City of Galveston, 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962).

cover because of unfitness of the ship arising from his own conduct in whole or in part. However, there is in this nothing inconsistent with the nature of the liability because it is imposed regardless of fault; to the prescribed extent the owner is an insurer, though he may have no means of learning of, or correcting, the defect."

Judge Hand cited the rationale of *Sieracki* [Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099] to the effect that the shipowner is in a position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear the loss. The Supreme Court cited *Grillea* with evident approval in Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). In *Crumady*, the longshoreman instituted an admiralty suit against the ship. The winch, an appurtenance of the vessel, was not inherently defective, but it was adjusted by the vessel owner in a way that made it unsafe and dangerous. The stevedore's employees did not reset the winch, but used it as it was provided. The finding was that the stevedores did no more than bring the unseaworthy condition of the vessel into play and that the unseaworthy condition arose from the vessel owner's disregard of the safety limits in adjusting the winch. *Crumady*, in essence, is a case where the liability-inducing unseaworthiness was created by the shipowner and is not applicable to the problem of operating negligence.

A recent case from the Third Circuit, Ferrante v. Swedish American Lines, 331 F.2d 571 (1964) illustrates the "ship owes it" approach. Acknowledging that the Supreme Court had not spoken on the question of operating negligence and that there was a split in the Circuits, the Court held as a matter of law that a stevedore's negligent use of a ship's seaworthy equipment makes the ship unseaworthy and liable for resulting injuries to a longshoreman. The Third Circuit predicated its decision on what it char-

acterizes as "doctrinal trends" evidenced by the Supreme Court decisions since *Sieracki,* and has been consistent. See Spann v. Lauritzen (1965), 3 Cir., 344 F. 2d 204.

In sharp contrast to the decision and methodology of the Third Circuit are opinions from the First Circuit in Arena v. Luckenbach, 279 F.2d 186 (1960), from the Second Circuit in Puddu v. Royal Netherlands S.S. Co., 303 F.2d 752 (1962), from the Fifth Circuit in McQuiston v. Freighters & Tankers S.S. Co., 327 F.2d 746 (1965), and from the Ninth Circuit in Billeci v. United States, 298 F.2d 703 (1962). In *Arena* the First Circuit rejected the doctrine of operating negligence and held that the shipowner had nothing to do with the loading of the vessel, and hence liability depended on the proof of defective or improper equipment. There, the longshoreman had been injured while loading rolls of paper aboard the ship. Judge Aldrich, speaking for the Court, summed up the First Circuit's view by stating:

"If a winchman employed by a stevedore negligently lowered a boom onto a longshoreman, it would be true, in a sense, that the longshoreman had not been working in a safe place. But absent a showing that the winchman was an unfit individual we could not say that the vessel was unseaworthy."

In *Puddu,* the Second Circuit turned its judicial back on *Grillea* of the preceding decade in a series of opinions which reflect the division between the judges. The majority held, and re-affirmed its decision sitting en banc, that because the ship's equipment was in good condition and the cause of the accident was the operating negligence of the longshoremen, the shipowner's duty of providing a seaworthy ship had been met, and libellant could not recover. Judge Hays opposed putting liability on the shipowner, but was troubled at where the line was to be drawn between operating negligence on a seaworthy ship and negligence of longshoremen which makes the ship unseaworthy. He felt that the shipowner

should not be held for those accidents which arise out of the continuous course of longshoremen operations. Judge Clark in a spirited dissent argued that the *Sieracki* rationale of liability without fault was just as binding on the Circuit as it had been when the *Grillea* panel had bottomed their opinion on it, and that the shipowner should be liable for all losses caused by all foreseeable hazards, avoidable or not, which are normally incident to the shipping trade, with operating negligence being one of these. The Second Circuit has recently reaffirmed its position in Reid v. Quebec Paper Sales & Transportation Co., 340 F.2d 34 (1965) in which the Court allowed the libellant to recover because of a ship's failure to provide a safe place to work. Judge Marshall was careful to distinguish the situation involving a relatively inaccessible hold reached by rigged portable ladders which fell, injuring the longshoreman from one involving improper use of proper equipment.

The latest decision by the Ninth Circuit is Huff v. Matson Navigation Co., 338 F.2d 205, cert. denied 380 U.S. 943, 85 S.Ct. 1026, 13 L.Ed.2d 963. There, the majority held categorically that improper use of equipment by the longshoremen made the ship unseaworthy. In *Huff* a dockside crane hit a longshoreman while it was being used to unload sugar from a vessel.[5] The Court reviewed all the Supreme Court jurisprudence and came to the same conclusion as the Third Circuit did in *Ferrante*. Judge Barnes of the Ninth Circuit, dissenting, relied heavily on previous Ninth Circuit decisions. It should be noted that in *Huff* the district court had found in favor of the vessel owner on the grounds that the vessel owner was not responsible for the negligent acts of the stevedore, and this was reversed. Both the majority and dissent reviewed at length the jurisprudence and cited extensively the Ninth Circuit cases which,

to say the least, reveal a sharp division of opinion in that circuit.

In *McQuiston*, supra, the Fifth Circuit clarified its position, thus resolving the ambiguity which had resulted from its hesitant language in Neal v. Lykes Bros., 5 Cir., 306 F.2d 313 (1962). In *Neal* the longshoreman's cause of action concededly rested solely on the alleged unseaworthiness of the vessel. The facts of *Neal* (like those of *Huff*) are very similar to the instant case. The longshoreman was pinned between the swinging load and the hatch pontoons. There, the jury concluded, and it was affirmed all the way, that the negligence of the gang foreman of the stevedores, in directing the operation of the winch, was the cause of the injury, and that this did not make the ship unseaworthy. This opinion did not give any guidelines as to just what negligence did cause the ship to be unseaworthy, when it said:

"There can, of course, be no dispute that a shipowner is not liable for the negligence of longshoremen acting as servants or employees of an independent stevedoring contractor, unless such negligence creates an unseaworthy condition."

In *McQuiston*, the Court endeavored to meet the issue head on, and Judge Johnson, writing for the Court, stated:

"In the absence of any indication that there was some defective or improper equipment chargeable to the shipowner which caused the injury, there was nothing before the trial court that could sustain a finding of disputed material facts as to seaworthiness, seaworthy appurtenances or negligence of the Master, officers and crew. It was proper, therefore, for the District Court to conclude as a matter of law that the steamship company was entitled to a summary judgment. Arena v. Luckenbach Steamship Company, 1 Cir., 279 F.2d 186, cert. denied 364 U.S. 895, 81 S.Ct. 222, 5 L.Ed.2d 189."

5. This factual context in the instant case seems strongly reminiscent of *Huff*.

*McQuiston* is important not only because of its unequivocal language, but also because the Court used that language in sustaining summary judgment. It must be conceded, however, that the facts of *McQuiston* were of such a nature that there was absolutely no basis for liability. The only unseaworthiness claim was that the shovel which was being used by the longshoreman was of too great a capacity and that the shovel, because of its capacity, caused him to wrench his back. There was a total lack of evidence in the record to support that contention.

The result of the "ship owes it" doctrine would do nothing more than to give to longshoremen working aboard the ship the same protection to which a seaman is entitled. If a seaman is injured and the injury is caused by the negligence of a co-employee, the seaman has a Jones Act remedy. Why should a seaman be protected against negligence of his co-employee, and a longshoreman doing a seaman's work be denied similar protection? The Supreme Court has not yet given us the answer, but doctrinal trends evidenced in its decisions since *Sieracki* suggest that the Supreme Court may eventually characterize a stevedore's negligence in the use of a ship's seaworthy equipment as unseaworthiness. This, in effect, would permit a longshoreman "doing a seaman's work" to recover when injured as a result of the negligence of a co-employee.

Some courts have made a distinction between an accident caused by a longshoreman's negligence and one caused by an unsafe condition of the work place, which in turn may be due to an act of negligence. In these cases the courts have held that only in the latter case would the warranty of seaworthiness be breached. We encounter difficulty in grasping this distinction, for surely every act of negligence at the work place, no matter how short lived, creates a threat to the safety of the person exposed to it. This artificial distinction has evolved a tendency for courts to effectuate the principle of equal protection for longshoremen by equating negligence with unseaworthiness, knowing full well that the ship, of course, would escape scot free, and her only role would be as a conduit to impose on a stevedore a liability exceeding what Congress made exclusive by Section 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 905.

■ The obvious trend of the Supreme Court decisions is toward providing ever-increasing protection for crewmen, longshoremen and even those employed by independent contractors who may be called upon to work aboard vessels. All of the considerations which gave birth to *Sieracki* and its progeny dictate that the vessel owner should not be free to nullify the remedies afforded seamen or those doing the work of seamen by parceling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing the ship's work of their historic and legislative protection. However, in the instant case the shipowner was not negligent with respect to any duty it owed Antoine. The ship, its equipment and appurtenances were all in top notch shape. The crew was fit and the method of loading and stowing the cargo was proper. The ship was not unseaworthy in the historic sense. Antoine was injured due to his own negligence and that of a fellow longshoreman. The co-employee's negligence consisted in not keeping a proper lookout when he was lowering the load. The Third Circuit, through its reasoning in *Ferrante* (supra) and the Ninth Circuit through its reasoning in *Huff* (supra), might well have concluded that the co-employee's negligence denied to Antoine a safe place to work, and that consequently the ship was not seaworthy, or they might have said that because of the negligence of the co-employee the unloading was not being performed in a proper manner. Any conclusion of unseaworthiness in the instant case would necessarily be premised on an unsafe place to work, a few seconds in duration,

created by a co-worker's lowering the load without keeping a proper lookout. The Fifth Circuit's language in *Neal* and *McQuiston* prohibits us from characterizing "operational negligence" as "unseaworthiness". The plaintiff's case should be dismissed. It is.

Counsel for defendant should present decree.