Monroe **TAYLOR**, Plaintiff,

v.

SS **HELEN LYKES**, etc., and Lykes Bros. Steamship Co., Inc., Defendants.

No. 6698.

United States District Court
E. D. Louisiana,
New Orleans Division.

May 8, 1967.

Clifton S. Carl, Richard J. Garrett, New Orleans, La., for plaintiff.

M. D. Yager, New Orleans, La., for defendants.

RUBIN, District Judge.

### FINDINGS OF FACT

1. Monroe Taylor was employed by Lykes Bros. Stemship Co., Inc., as a longshoreman on July 13, 1961, and was assigned to stow bags of wheat, weighing about 180 pounds each, in the lower 'tween deck of the vessel, SS HELEN LYKES.

2. Taylor had worked more than 10 years as a longshoreman, and he had experience in loading sacked cargo of the type he was handling on this occasion.

3. The proper procedure to load this type of cargo is first to stow the bags of wheat to a height of about three feet all around the square of the hatch. The wheat would then be stacked in tiers three or four sacks high. Then a dunnage floor should be built on the wheat, and additional bags should be stowed in tiers to the height of the overhead.

4. The wheat bags which are to be loaded into the hold are stacked on pallets and lowered into the hold on these pallets. After the dunnage floor is built, the proper procedure is for the longshoremen to use a landing table or to build such a table of pallet boards. The table thus built should be approximately the same height as the dunnage floor.

5. Good stevedoring practice requires that a landing table or other suitable work platform be employed when blocking out a sacked grain cargo ten high to avoid the necessity of the longshoremen lifting or pitching heavy cargo above their heads.

6. A dolly made of heavy pipe rollers should be used to move the cargo from the landing table in the square of the hatch to the point in the hold where it is to be stowed.

7. When the hold is nearly filled, and the cargo is blocked out, the last part of it must be stowed by pitching the bags from the landing table to the top of the stack. This is done by the longshoremen working in teams.

8. The exact height of the stack was not shown, but the top of the stack of ten sacks would be over the plaintiff's head.

9. No landing tables were provided from which the longshoremen could work in blocking out the tops of the stacks of wheat sacks, but there were pallet boards available from which landing tables could have been made, since all of the wheat was brought in on pallets.

10. After every two or three drafts of cargo were stowed, the longshoremen discharged some of the empty pallet boards. The rest were discharged when loading was completed.

11. A stack of empty pallet boards is a satisfactory substitute for a landing table, and pallet boards were available for use as a working platform.

12. Neither the plaintiff nor any other member of the gang asked that a landing table be provided for the blocking out operation.

13. On July 13, 1961, the longshoremen working in the crew with plaintiff divided the work among members of the gang so that two men removed sacks from the loaded pallet boards, two men passed the sacks from the landing place to the place where they were to be stowed, and two men stowed the sacks.

14. A preponderance of the evidence indicates that, as the plaintiff contends, in the course of loading the SS HELEN LYKES, the proper procedure was not followed, a dunnage floor was not built, and the sacks were stacked ten high throughout the operation.

15. The plaintiff suffered a low back injury while he and his work partner were throwing a sack of wheat to the top of a stack ten sacks high. This happened when he and his work partner were throwing the last few sacks into position as they blocked the cargo out to the overhead at the edge of the hatch square.

16. Loading operations in the 'tween deck were almost completed, and it would then have been necessary to throw the wheat bags to the top of the stack in any event, that is whether or not a work platform was being used, but if there had

been a platform, the height of the throw would have been less.

17. The plaintiff's own failure to use available pallet boards as a platform from which the blocking out could have been safely accomplished constituted negligence on the part of plaintiff; his work partner, Dunn, joined in doing the work in this manner.

18. The gang foreman was not in the hold when the plaintiff was injured, and he had given no special instructions for the loading operation. He did not instruct the gang as to the manner in which the work was to be performed or as to how the loading was to be accomplished. Experienced longshoremen generally know how to do this kind of work and it is not necessary to give them special instructions.

19. The plaintiff received medical expenses and compensation from his employer in the amounts of $177.30 and $282.48 respectively in accordance with the provisions of the Longshoremen's and Harbor Workers' Compensation Act.

## CONCLUSIONS OF LAW

### I. LIABILITY OF THE SHIPOWNER TO A LONGSHOREMAN DIRECTLY EMPLOYED BY IT FOR UNSEAWORTHINESS

The shipowner asserts that it is liable only under the Longshoremen's and Harbor Workers' Compensation Act,[1] and

that it has satisfied this liability. But the *Yaka* decision[2] has been generally considered to impose liability on the shipowner for injuries sustained by a longshoreman as a result of unseaworthiness even when the owner of the vessel directly employed the longshoreman and did its own stevedoring.[3] While this result flies in the face of apparently express language to the contrary in the Longshoremen's and Harbor Workers' Compensation Act,[4] it is apparently a necessary consequence of the rationale of the *Yaka* opinion.

### II. WAS THE VESSEL UNSEAWORTHY?

#### A. Failure to Provide Pallet Boards.

The failure of the shipowner to provide landing tables would not alone make the vessel unseaworthy. The plaintiff alleges that the owner's failure to provide *either* landing tables *or* sufficient pallet boards for use as landing tables created the unseaworthy condition. But the pallet boards were in the hold all along. If the plaintiff didn't use them, it was only because he chose not to. The proper gear was provided.[5] It was then up to the longshoremen to use it. And the shipowner is not responsible if a seaman fails to use the gear provided for him.[6] This is merely negligence on the part of the seaman, for which the shipowner is not responsible

1. 33 U.S.C.A. § 901 et seq. See particularly 33 U.S.C.A. § 905.

2. Reed v. S.S. Yaka, 1963, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448.

3. Watson v. Gulf Stevedore Corp., 5 Cir., 1967, 374 F.2d 946; Course v. Pacific Inland Navigation Company, D.Org., 1964, 234 F.Supp. 676, 386 U.S. 963, 87 S.Ct. 1029, 18 L.Ed.2d 112; aff'd, 9 Cir., 1966, 368 F.2d 540, petition for cert. Santiago v. Hermanos, D. Puerto Rico, 1966, 255 F.Supp. 932; Hertel v. American Export Lines, Inc., S.D.N.Y., 1964, 225 F. Supp. 703. Contra, Jackson v. Lykes Bros. SS Co., Inc., La.App., 185 So.2d 342, cert. denied, 1966, 249 La. 460, 187 So.2d 441, cert. granted, 1966, 385 U.S. 967, 87 S.Ct. 502, 17 L.Ed.2d 432, argued April 12, 1967, 386 U.S. ——, 87 S.Ct. 1419, 18 L.Ed. 488.

4. 33 U.S.C.A. § 905 reads in part as follows:
   "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, * * * *."

5. The Osceola, 1903, 185 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, 2nd proposition of law; Mahnich v. Southern SS Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. Also see, Norris, The Law of Seamen, Vol. II, § 616.

6. Norfleet v. Isthmian Lines, Inc., 2 Cir., 1966, 355 F.2d 359; Billeci v. United States, 9 Cir., 1962, 298 F.2d 703.

under the doctrine of unseaworthiness,[7] although of course compensation benefits are due those seamen who are covered by the Longshoremen's and Harbor Workers' Compensation Act regardless of the cause of their injury.

B. *Plan of Operation.*

An improper plan for cargo loading may create an unseaworthy condition.[8] There is no evidence that the shipowner had an unsafe plan of operation. The longshoremen went into the hold to stow wheat. The plan of operation was to do this in the customary manner. There were no special instructions. No one told the plaintiff or any other longshoremen to proceed in a hazardous manner. If there was any fault in the plan of operation, it was created by the plaintiff and his work partner, who were throwing sacks to the top of the block. The fault was created by plaintiff and his work partner together.

The Court of Appeals for the Fifth Circuit has recently held that the shipowner is not liable for " 'instantaneous unseaworthiness', based upon the very act of a fellow longshoreman which causes the injury." Antoine v. Lake Charles Stevedores, Inc., 5 Cir., 1967, 376 F.2d 443, 35 U.S. Law Week 2620. In that case the court concluded that, "[T]he operational negligence of the employee of an independent contractor occurring at the moment of injury to co-worker, does not render the vessel unseaworthy." See also dicta in Robichaux v. Kerr-McGee Oil Industries, Inc., 5 Cir., 1967, 376 F.2d 447. A fortiori, if the injured employee was himself engaged in the act of negligence at the "very moment of the negligent use," there can be no recovery for unseaworthiness.

In determining whether a longshoreman can recover for an unseaworthy condition, many courts have sought to draw a distinction between negligence of the longshoreman himself or of his co-workers resulting directly in his injury and a negligent act that created a hazardous and hence unseaworthy condition that later caused the seaman to be injured.[9] Lines too fine to spin have been drawn and metaphors neatly turned in literary phrases have been put.

The literary contribution however has not added to the effective formulation of a rule that the shipping industry could understand and apply. An attempt to analyze the explanations offered in some of the opinions led only to the desire to lament, like Mark Twain and Mr. Justice Jackson, that, "The more you explain it, the more I don't understand it." [10] The rule adopted by the Fifth Circuit is clear and workable. Applying it, we conclude that the plaintiff, having recovered benefits under the Longshoremen's and Harbor Workers' Act, is entitled in this case to no more.

Here the plaintiff was not employed by an independent contractor. But the same rationale must apply because the plaintiff can file this suit un-

---

**7.** McQuiston v. Freighters and Tankers Steamship Company, E.D.La., 1963, 217 F.Supp. 701, aff'd 5 Cir., 1964, 327 F.2d 746; Imperial Oil v. Drlik, 6 Cir., 1956, 234 F.2d 4, cert. denied, 1966, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236.

**8.** See dicta in Morales v. City of Galveston, 1962, 370 U.S. 165, 170, 82 S.Ct. 1226, 1230, 8 L.Ed.2d 412, 416. Compare Scott v. Isbrandtsen Co., 4 Cir., 1964, 327 F.2d 113, in which the Court held that "evidence of the negligence of the longshoremen themselves in the performance of the ship's work and in their method of operation may present a factual issue as to whether an unseaworthy condition is created  *  *  *."

**9.** Radovich v. Cunard Steamship Co., 2 Cir., 1966, 364 F.2d 149; Huff v. Matson Navigation Company, 9 Cir., 1964, 338 F.2d 205; Puddu v. Royal Netherlands SS Co., 2 Cir., 1962, 303 F.2d 752; Arena v. Luckenbach, 1 Cir., 1960, 279 F.2d 186; Grillea v. United States, 2 Cir., 1956, 232 F.2d 919; Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555. These decisions were reviewed in a comprehensive analysis by Judge Edwin F. Hunter in Antoine v. Lake Charles Stevedores, Inc., W.D.La., 1965, 249 F.Supp. 290.

**10.** Securities and Exchange Commission v. Chenery Corp., 1947, 332 U.S. 194, 214, 67 S.Ct. 1575, 1762, 91 L.Ed. 1995, 2008.

der the *Yaka* rule only because his rights should be no *less* than those he would have had he been employed by an independent stevedore. Neither should they be greater.

The Clerk will prepare a judgment in favor of the defendants.