## Leo SHERBIN
### v.
## S. G. EMBIRICOS, LTD.
### Civ. A. No. 2329.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Jan. 2, 1962.

H. Alva Brumfield and Robert Turner, Baton Rouge, La., for plaintiff, Leo Sherbin.

Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, La., for respondents, S. G. Embiricos, Ltd. and Compania Naviera Resolute, S.A., and for Third Party Complainant, Compania Naviera Resolute, S.A.

Percy & Macmurdo, Edward W. Gray, Baton Rouge, La., for Third Party Defendant, Baton Rouge Marine Contractors, Inc., and for Intervenor, Hartford Acc. & Indemnity Co.

WEST, District Judge.

The plaintiff, Leo Sherbin, is a resident of the State of Louisiana, and at the time of the accident complained of, was in the employ of Baton Rouge Marine Contractors, Inc., a Louisiana stevedoring corporation. The respondent, Compania Naviera Resolute, S.A., is a non-resident, foreign corporation, and is the owner of the ship S/S Dorian. (Plaintiff originally named as respondent S. G. Embiricos, Ltd., but later amended his complaint to name as respondent Compania Naviera Resolute, S.A., the true owner of said vessel.)

The S/S Dorian is an ocean-going vessel, and at the time of the accident sued upon, was docked at the Port of Baton Rouge, Louisiana, for the purpose of taking on a cargo of grain.

The plaintiff alleges that on May 25, 1959, he received a severe crushing injury to his ring finger on his left hand, as a result of his hand being caught "on a motor used on the said vessel". The plaintiff alleges further that "the accident was a result of the unseaworthiness of the S/S Dorian in that the motor on board ship was defective, improperly designed and adjusted and not equipped with safeguards and otherwise unfit for the use for which it was being used, and the neglect, inattention and carelessness of the master, officers, crew, owners and operators of the S/S Dorian". The plaintiff seeks to recover the sum of $100,000 as a result of the injury to his finger and for "other permanent damage to his left hand plus mental damages to his detriment".

Respondent, with leave of Court, filed a third party complaint, making the plaintiff's employer, Baton Rouge Marine Contractors, Inc., a third party defendant, and demanded judgment against said third party defendant "for any sums that may be adjudged against said defendant, Compania Naviera Resolute, S.A., in favor of complainant, Leo Sherbin". A petition of intervention was then filed by Hartford Accident and Indemnity Company, alleging that it had issued to Baton Rouge Marine Contractors, Inc. an insurance policy insuring said company against liability to its employees under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., and that as a result of the accident now complained of, it had paid to the plaintiff the sum of $781.16 as benefits to which he claimed to be entitled under the provisions of the said Longshoremen's and Harbor Workers' Compensation Act. Hartford seeks to recover this amount, plus reasonable attorney's fees, in the event plaintiff is successful in his claim against respondent, Compania Naviera Resolute, S.A. Plaintiff originally prayed for a trial by jury, but prior to trial, by agreement of counsel, a jury was waived and the matter was tried to the Court alone.

Evidence adduced upon the trial of this case showed that on May 25, 1959, plaintiff, while in the course of his employment as a longshoreman, and while

working as an employee of Baton Rouge Marine Contractors, Inc., a stevedoring company, he was in the process of helping to load grain aboard the S/S Dorian. He was in the lower hold of the ship where the grain was being loaded from an elevator which was located on the dock. The grain came through a spout from the elevator and was directed into a chute attached to the top of a machine known as a "grain trimmer". The grain trimmer was located in the hold, and as the grain went down the chute into the grain trimmer, it hit upon a belt which in turn shoots the grain out of the grain trimmer in whatever direction the grain trimmer is pointed or directed at the time. This is done in order to obtain uniform loading of the ship. If this were not done, the grain would simply pile up in one place and would then have to be leveled off by hand or by some other means.

This grain trimmer is a very heavy piece of equipment, and, as the plaintiff said, "ten men couldn't pick it up". It is eight or ten feet high, and is brought aboard the ship by use of a crane. It is then lowered into the hold by use of a cable attached to the ship's boom, and it is thus kept partially suspended so that it can be turned in different directions by hand during the loading operation. If it becomes embedded in the grain, it is raised by the ship's winch to a position whereby it may be turned in different directions by the men in the hold.

It was when the plaintiff attempted to thus change the position, or direction, of the grain trimmer that this accident occurred. As he grabbed onto the grain trimmer to turn it, his hand slipped through a broken place in the guard covering the revolving fan, thus allowing his hand to come into contact with the revolving fan in the machine, causing a partial amputation of his finger. There is apparently no dispute about the fact that at the time of the accident a piece of the fan guard was missing, leaving a space whereby the plaintiff's finger could slip through it and thus come into contact with the revolving fan. The evi-

dence shows without contradiction that (1) the grain trimmer was owned by the stevedoring company, Baton Rouge Marine Contractors, Inc.; (2) that plaintiff was the employee of Baton Rouge Marine Contractors, Inc., and that at the time of the accident involved, he was performing the duties of his regular occupation as a longshoreman; (3) that a grain trimmer such as was involved in this accident is a piece of equipment not regularly or traditionally found on ships as a regular piece of ship's gear, but that on the contrary, it is always owned by the stevedoring company and is operated by the longshoremen employed by the stevedoring company in the performance of loading operations; (4) that the electricity necessary for the operation of the grain trimmer is secured dockside and not from the ship itself; (5) that at the time of the accident, approximately ten men were engaged in the loading activity, all of whom worked for Baton Rouge Marine Contractors, Inc., and none of whom were members of the ship's crew; (6) that the grain trimmer in question was defective in that the fan guard was broken, leaving an unguarded area large enough for the plaintiff's hand to come into contact with the revolving fan; (7) that all of the loading operations in question were being directed by and exclusively done by longshoremen in the employ of Baton Rouge Marine Contractors, Inc., and that none of the loading operations involved were under the control, supervision or direction of the officers, owners, or any member of the crew of the S/S Dorian. No attempt was made to in any way prove any negligence on the part of the ship owner or any of the officers or members of the crew of the S/S Dorian. Thus, we are confronted only with the question of whether or not the defective grain trimmer was a part of the "hull, gear, stowage, appurtenant appliances and equipment" of the ship such as to make its defective condition constitute unseaworthiness on the part of the ship, S/S Dorian, and to thus impose liability on the ship owner for injury caused thereby to a longshoreman

while engaged in the process of loading the ship.

Under the settled law as pronounced in Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, a longshoreman, while performing a "ship's service", is entitled to protection against unseaworthiness. As further proclaimed in Sieracki, unseaworthiness pertains to the "hull, gear, stowage, appurtenant appliances and equipment" of the ship. When defective equipment falling within one of these categories causes injury to a longshoreman engaged in a "ship's service", unseaworthiness must be found and the longshoreman thus protected.

By judicial determination over the years of what constitutes the "hull, gear, stowage, appurtenant appliances and equipment" of a ship, the sphere of liability of the ship owner has been constantly enlarged by extending the doctrine of unseaworthiness to cover many items of equipment, even though such equipment may be owned by the stevedore and exclusively used by the longshoremen or stevedores in loading and unloading operations. See Alaska S. S. Company v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. U. S. Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Considine v. Black Diamond Steamship Company, D.C., 163 F.Supp. 107, 108.

Indeed, in the case of Considine v. Black Diamond Steamship Company, supra, the Court seemed to extend the doctrine of absolute warranty of seaworthiness to equipment of every kind and nature when used in the performance of a ship's service even though it stated that it could see no "logic or social necessity, let alone legislative policy" for so doing. The Court in Considine apparently felt that this apparent unlimited extension of liability was indicated by such cases as Alaska S. S. Company v. Petterson and Rogers v. U. S. Lines, supra. The Court in Considine stated that it could "perceive here no rational stopping place".

I do not agree that there is "no rational stopping place" to the extension of liability without fault such as is involved in cases of unseaworthiness. The case of McKnight v. N. M. Paterson & Sons, Ltd., D.C., 181 F.Supp. 434, affirmed 6 Cir., 286 F.2d 250, provides a most logical stopping place. In McKnight, the Court applied the test of whether or not the allegedly defective equipment causing the injury was the type of equipment that is usually or traditionally found on a ship as a part of its regular gear or equipment. The Court held that if the equipment causing the injury was such as is usually or traditionally found on a ship as a part of the ship's regular gear, then such equipment would be found to have been incorporated into the ship's regular gear at the time of the accident, and to be covered by the absolute warranty of seaworthiness. The Court in McKnight noted that in practically all cases where liability for unseaworthiness had been found, the equipment causing the injury was such as is ordinarily or traditionally found as a part of the ship's regular gear or equipment. The Court further expressly rejected the Considine case insofar as it extended the warranty of seaworthiness to equipment not traditionally found as a part of the ship's regular gear.

In Rogers v. U. S. Lines, supra, while the equipment immediately causing the injury was owned by the stevedore, and used only by the longshoremen in unloading operations, nevertheless, the Court found that the equipment involved had, at the time of the accident, been so incorporated or integrated with the ship's regular gear as to make it a part thereof. But in that case, it was actually the operation of the ship's winch that caused the stevedore's fall runner to move as it did, striking the plaintiff and causing injury thereby. Thus, in Rogers it was the combined use of the ship's gear and the stevedore's equipment which, acting in concert, caused the injury to the plaintiff. It is not difficult in such a case to see how the Court could conclude that under such circumstances, the equipment of the stevedore became part of the ship's gear. The accident and injury in that case were caused as

much by the improper operation of the ship's gear as by any defect or improper use of the stevedore's equipment. Both the ship's gear and the stevedore's equipment working together caused the injury complained of.

The Rogers case is easily distinguishable, however, from the instant case. In the present case, while the grain trimmer was temporarily attached to the ship by a cable from the ship's boom, nevertheless, there was absolutely no connection between the injury received by the plaintiff and either the condition or the operation of any of the ship's gear or equipment. The injury to the plaintiff was caused solely and entirely by a defect in the grain trimmer itself, and was in no way related to nor caused by the manner in which it was attached to the ship, nor was it in any way related to or caused by the manner in which the ship's winches, booms, cables, or other equipment were being used or operated. The cause of the injury to the plaintiff in this present case in no sense could be attributed to the vessel or its appurtenances since the injury was caused solely and entirely by a defect in the grain trimmer itself, and the grain trimmer, according to all of the uncontradicted evidence adduced at the trial of this case, was not such equipment as is usually or ordinarily or traditionally found as a part of a ship's regular gear. All of the testimony shows clearly that the grain trimmer in question was owned and operated exclusively by the stevedoring company and its employees, and that its only function was to assist the longshoremen in loading grain onto the ship. No witness had ever known of an instance where a grain trimmer such as this was owned by the ship owner or where a grain trimmer was kept aboard a ship as a part of the ship's gear. It had no function insofar as navigation of a ship was concerned, but was merely used by the stevedores and longshoremen as a convenience in performing their loading duties. It was brought aboard the ship by the stevedoring company at the commencement of the loading operation, and it was removed from the ship by the longshoremen at the conclusion of the loading operation. The testimony further showed that the grain trimmer was always used by the stevedores and longshoremen, and was never used by the members of the ship's crew. It was merely a tool employed exclusively by stevedores as a convenience to them in the performance of their stevedoring duties.

When unseaworthiness is found, a situation of liability without fault on the part of the ship owner is created. While the increasing policy of the law is towards liberality in affording to injured longshoremen recourse against the vessel owner, nevertheless I feel that such a doctrine of liability without fault should be contained within reasonable limits. I believe that reasonable limits are prescribed in McKnight v. N. M. Paterson & Sons, Ltd., D.C., 181 F.Supp. 434, affirmed, 6 Cir., 286 F.2d 250, and it is my opinion that when the test therein enunciated is applied here, we must conclude that there is no liability on the part of the ship owner for the injuries herein complained of. While the plaintiff was doing a ship's service, and while he may have been doing a seaman's traditional work, he was nevertheless incurring a stevedore's hazard rather than a seaman's hazard while using the grain trimmer to assist him in his duties. The plaintiff was a longshoreman, doing a longshoreman's work, and he did, in fact, recover benefits due him under the provisions of the Longshoremen's and Harbor Workers' Compensation Act. It is the opinion of this Court that the plaintiff's injuries were covered exclusively by the provisions of the Longshoremen's and Harbor Workers' Act, and that the S/S Dorian was not unseaworthy.

This opinion shall be deemed to constitute my findings of fact and conclusions of law in compliance with the provisions of F.R.Civ.P. 52, 28 U.S.C. A judgment may be presented in conformity with the views herein expressed.