**Eddie HUFF, Appellant,**

v.

**MATSON NAVIGATION COMPANY,**
a Corporation, Appellee.

**No. 19151.**

United States Court of Appeals
Ninth Circuit.

Oct. 22, 1964.

Barnes, Circuit Judge, dissented in part.

---

Dorsey Redland, Van H. Pinney, San Francisco, Cal., for appellant.

E. Judge Elderkin, Brobeck, Phleger & Harrison, San Francisco, Cal., for appellee.

Before POPE and BARNES, Circuit Judges, and THOMPSON, District Judge.

POPE, Circuit Judge.

The appellant, libelant below, was a longshoreman employed by Matson Terminals Company, a stevedore, and was working in the hold of a vessel owned and operated by the appellee when he received certain injuries. He brought this suit against the appellee to recover for such injuries, asserting his rights under the general maritime law. The case was submitted to the district court upon a stipulation of facts which read as follows:

"It is hereby agreed by and between EDDIE HUFF, libelant herein, and MATSON NAVIGATION COMPANY, respondent herein, through their respective proctors, that the issue of negligence and the issue as to whether the doctrine of unseaworthiness extends to the land-based crane and its appurtenances referred to in the above-captioned cause may be submitted to and decided by the Honorable Lloyd H. Burke, sitting in Admiralty, without a jury, on the statement of facts, hereby stipulated to by the parties, set forth below.

"It is further agreed that if the Court finds in favor of the respondent on both of the aforesaid issues that a final decree and judgment, with costs, may be entered in favor of respondent, without further proceedings. If the Court should find in favor of the libelant on either of the aforesaid issues, the matter will be set for trial on the remaining issues at a time convenient to the Court and the parties.

"Libelant is a fifty-three year old longshoreman who has been so employed since 1944. He is a member of Local 10 of the International Longshoremen's and Warehousemen's Union and is assigned work with various stevedoring employers through that union.

"On June 14, 1960, libelant, along with other members of Gang 28, was dispatched from the union to work at Crockett, California, as an employee of a stevedoring contractor, Matson Terminals, Inc. ("Stevedore"). The work at Crockett involved the discharging of bulk sugar from the SS HAWAIIAN TRADER, a vessel owned and operated by respondent. Libelant, as well as other members of Gang 28, was familiar with the operation at Crockett, since he had been performing that work at

least twice a month over a period of ten years. Libelant arrived at Crockett at about 5:00 o'clock in the afternoon of June 4, 1960, and proceeded to the vicinity of the No. 4 hatch of the vessel where he commenced performing duties of his regular occupation as longshoreman.

"The longshoring operation at Crockett is relatively simple and is accomplished through the use of four large gantry-type cranes which are an integral part of the sugar refinery of the California and Hawaiian Sugar Refining Corporation, Limited and are permanently attached to the shore. (Exhibit A).* These cranes are never found on ships as a regular part of ship's gear. They move up and down tracks which are on a pier owned by and adjacent to the sugar refinery.

"As an integral part of each crane is a long 'leg' in which is contained a conveyor system consisting of small scoops and a long belt. The crane moves along the track to a location opposite one of the ship's holds and the leg is positioned in the open hatch (Exhibit B). Electricity for the operation of the crane is secured dockside and not from the ship itself. Through the use of the conveyor system, the sugar is scooped out of the hold and transported on a conveyor belt (Exhibit C) into the sugar refinery where it is dumped into large containers (Exhibit D). When the operation is completed, the crane is returned to its original position. The crane is not required for the navigation of the ship and is not necessary for the ship to function as a maritime vessel.

"At no time is the leg itself or the gantry ever physically attached to the ship nor do they come into contact with any part of the ship or its appurtenances. None of the ship's gear is used to move or position the crane nor is any of the ship's gear or appurtenances involved in any way in the unloading process. In the initial stage of the operation, the leg removes the sugar through the process of merely burrowing down into the hatch (Exhibit E), as the sugar falls toward the center. Later on, it is necessary to rig falls to which are attached scrapers which drag the sugar to conveyors located in the leg. These falls are run through blocks which are attached to the sides of the hold solely for the sake of convenience. The scrapers, falls and blocks, are component parts of, and attached to, the crane. The scrapers and the falls are also operated by shoreside power. The movement of these scrapers is remotely controlled by a button box which is operated by one of the longshoremen who sits either on deck or in the hold (Exhibit F). There are two handles, one on each end of the box, which control the movement of the scraper. Pushing the handle on the right side of the box away from the operator causes the scraper to be hauled back from the leg to the right side of the hold; and conversely with the other handle. Pulling either handle toward the operator causes the scraper to move toward the leg.

"There is constant tension on all of the falls and in order to obtain slack it is necessary to release this tension by pressing a button which is located on top of the handle on the right side of the button box. However, all operators have been instructed that it is mandatory to turn off the power operating the scraper, before slack is to be obtained on the falls, or before the button box is left unattended. In addition, the

* The crane involved in this case was constructed in 1950, pursuant to a contract between Stevedore and Stephens-Adamson Company. Progress payments on the construction were made by respondent because of the relatively low working capital of Stevedore. Settlement for such advances and the final charge against Stevedore for the cost of construction was made in October of 1950.

following legend is legibly attached to all of the button boxes:

### CAUTION

" 'Shut off motor when pulling wire or when box is left unattended.

### WORK SAFELY'

"The reason for shutting off the power when there is necessity to obtain slack is to preclude the operator, or anyone else, from inadvertently causing the scraper to move by actuating the handle as the button is depressed.

"When libelant arrived at work, the crane and the scrapers were in position, as the longshoreman on the day shift had already discharged the upper hold and started on the lower hold. The operation was uneventful until 8:30 o'clock P.M. At that time, one of the falls attached to the scraper broke and it was necessary to reattach the fall to the scraper. This was libelant's job and to accomplish it he needed to obtain slack on the fall so that he could pull it up to the scraper. He requested Mr. Collier, a fellow-longshoreman who was operating the button box and was down in the hold with libelant, to 'give me some slack.' As he asked Mr. Collier for slack, the scraper started moving toward the libelant and hit him.

"The only persons who participate in the unloading of the ship are the longshoremen. None of the ship's crew was aboard the vessel during the unloading process and they did not participate in any way. All of the longshoring operations were being directed by and exclusively done by longshoremen in the employ of the Stevedore and none of the loading operations in question were under the control, supervision or direction of the officers, owners, or any member of the crew of the SS HAWAIIAN TRADER. Respond-

ent had no control over the choice of the crane and no authority in the direction of its use." [1]

■ The trial court made findings of fact with conclusions to the effect that the respondent shipowning company was not chargeable with any negligence contributing to the injuries of the libelant; that the vessel was at all times seaworthy; and that the respondent was entitled to judgment. The court filed an opinion in which, after reciting that there was no basis for a finding of negligence, it made the following statement: "There is no question that a longshoreman is afforded the benefits of the doctrine of unseaworthiness when 'he is doing a seaman's work and incurring a seaman's hazards.' Seas Shipping Co. v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 880, 90 L.Ed. 1099 (1946). However, in the instant case, the longshoreman was *not* incurring the hazards of a seaman, in that none of the traditional unloading gear of the ship, namely winches, masts, or booms was being used in the operation in which he was engaged. McKnight, supra [McKnight v. N. M. Paterson & Sons, Ltd., D.C., 181 F.Supp. 434, affirmed 6 Cir., 286 F.2d 250, cert. den. 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed.2d 130]. The cause of the injury to the libelant cannot be attributed to the vessel since the injury was caused solely by an alleged defect in the unloading device itself and not by any of the ship's gear or appurtenances." Decree was entered in respondent's favor and this appeal followed. We find no reason to disagree with the trial court's finding of no negligence on the part of the shipowner, Matson Navigation Company. However, on the question of whether or not liability may be predicated upon a claim of unseaworthiness, we disagree with the conclusion reached below.

The law generally applicable to cases of this character, in which the longshoreman engaged in the process of unloading or loading a ship receives injuries

---

1. Attached to the stipulation were reproductions of six photographs showing the unloading equipment.

which he claims to be attributable to the unseaworthiness of the ship, has received extensive treatment in and is well settled by a series of decisions of the Supreme Court. These cases begin with Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and continue through Gutierrez v. Waterman, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297. In Sieracki, the Court held that "the shipowner's obligation of seaworthiness extends to longshoreman injured while doing the ship's work aboard but employed by an independent stevedoring contractor whom the owner has hired to load or unload the ship." (328 U.S. p. 89, 66 S.Ct. p. 875) The reason for that holding was stated as follows: "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. (citing cases) That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." (328 U.S. at p. 96, 66 S.Ct. at p. 878.)

In the October, 1953, term, the Supreme Court extended the principles of Sieracki through two per curiam opinions. In Petterson v. Alaska Steamship Co., 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, the Court affirmed the decision of this court, 9 Cir., 205 F.2d 478, upon the authority of the Sieracki case and the case of Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.[2] Petterson was an employee of a stevedoring company engaged by the shipowner to load the latter's vessel. In the performance of their duties the employees of the stevedoring company used a block which

the court assumed belonged to the stevedoring company and was brought on board by it. The block broke causing the injuries complained of by Petterson. Citing Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, and Sieracki, for the propositions that the shipowners' obligation to provide a seaworthy vessel is "a form of absolute duty owing to all within the range of its humanitarian policy" and one he could not delegate, this court had held that the shipowner's obligation of seaworthiness extended to unloading equipment furnished by the stevedore.[3]

In Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, summarily reversing (3 Cir.) 205 F.2d 57, a longshoreman in the employment of a stevedoring contractor was engaged with the other members of a gang in unloading a cargo of ore at a dock in Philadelphia. In that operation ore was being removed in tubs from the ship's hold to railroad cars on the dock. One of the tubs unexpectedly swung across the hold and struck Rogers, the longshoreman, causing his injuries. It was conceded that the cause of the accident was the improper operation of a landfall runner furnished by the stevedoring company and operated by one of its employees. The Court of Appeals said: "The statement that the vessel adopted the runner as an appurtenance is simply not justified by the record. * * * Since the wire alone or the manner in which it was handled, or both, caused plaintiff's hurts and since under the facts the presence of that wire cannot be construed as appellee's responsibility this judgment (for the shipowner) should not, for the reason urged, be disturbed."

2. In this latter case the carpenter employed by an independent contractor was injured while working on a ship berthed on navigable waters. The jury found the ship unseaworthy. Judgment for the carpenter was sustained, the Court holding that in view of the type of work he did, and its relationship to the ship, and to the historic doctrine of seaworthiness, the obligation of seaworthiness extended to the carpenter as well as to a long-

shoreman or stevedore for reasons comparable to those which supported the holding in Sieracki.

3. Further commenting on Sieracki, this court said: "It cannot be assumed that the Court meant that the stevedore should lose this protection merely because his immediate employer had temporarily assumed control of a portion of the ship without becoming the owner *pro hac vice*." (205 F.2d 480.)

It seems clear that, by this summary reversal, the Court was making it plain that the stevedore's ownership, operation or possession of defectively operating equipment in no manner lessened the shipowner's obligation of seaworthiness with respect thereto, and that the absence of proof that the vessel had adopted the runner as an appurtenance was wholly immaterial.

In Gutierrez v. Waterman S.S. Corp., supra, the Court held that the obligation of seaworthiness extended to bagging in which a cargo of beans was received on board ship. Gutierrez, a longshoreman unloading the respondent's ship at the dock, slipped on some loose beans spilled on the dock and suffered personal injuries. The beans had been packed in broken and defective bags which permitted them to leak and scatter on the surface of the pier. The Court held that unseaworthiness included "fitness for loading and unloading" ; that the use of defective cargo containers constitute unseaworthiness, stating: "When the shipowner accepts cargo in a faulty container or allows the container to become faulty, he assumes the responsibility for injury that this may cause to seamen or their substitutes on or about the ship." (373 U.S. pp. 213–214, 83 S.Ct. p. 1190.) That decision is significant for it must be noted that the bags were no part of the ordinary gear or equipment of the ship; the shipowner did not supply them but they were furnished by the shipper.

In the most recent case discussing the present problem, Italia Soc. v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732, the Supreme Court summarized the rules relating to a shipowner's liability to a longshoreman for unseaworthiness as follows: "The ship-owner is liable for unseaworthiness, regardless of negligence, whenever the ship or its gear is not reasonably fit for the purpose for which it was intended and this liability extends to longshoremen and others who work aboard the vessel, including those in the employ of contracting stevedore companies. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Mitchell v. Trawler Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. If the owner engages others who supply the equipment necessary for stevedoring operations, he must still answer to the longshoreman if the gear proves to be unseaworthy. Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798. This liability is strict and nondelegable. Mitchell v. Trawler Racer, supra; Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561." Particularly noteworthy is the next to last sentence in that quotation which makes it plain that the shipowner's obligation of seaworthiness extends to all equipment for loading or unloading supplied by the stevedoring contractor.[4]

There is another line of related decisions by the Supreme Court which, when considered with those to which we have just referred, disclose that the Court has been in the process of molding rules in admiralty calculated to provide increased protection for longshoremen engaged in this hazardous occupation.[4a] These related decisions include Ryan Stevedoring Co. v. Pan Atlantic S.S. Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Waterman S.S. Co. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169; Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448; and Italia Soc. v.

4. This rationale supports the decisions in numerous cases in the lower federal courts. Included in this list are the following: Pope & Talbot, Inc. v. Cordray, 258 F.2d 214 (9 Cir. 1958); Thorson v. Inland Nav. Co., 270 F.2d 432, 77 A.L.R.2d 825 (9 Cir. 1959); Hagans v. Ellerman & Bucknall SS Co., 318 F.2d 563 (3 Cir. 1963); Shenker v. United States, 322 F.2d 622 (2 Cir. 1963); Litwinowicz v. Weyerhaeuser SS Co., 179 F. Supp. 812 (E.D.Pa.1959).

4a. "[I]n the absence of controlling Acts of Congress this Court has fashioned a large part of the existing rules that govern admiralty." Wilburn Boat Co. v. Fireman's Ins. Co., 348 U.S. 310, 314, 75 S.Ct. 368, 370, 99 L.Ed. 337.

Ore. Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748.

In Ryan the Court held that the contract between the shipowner and the stevedoring company contained an implied warranty of workmanlike service, and that the company was liable over to the shipowner for damages paid by the shipowner to a longshoreman, employed by the stevedoring company, for injuries received in consequence of a condition created by the latter's negligence.

In Waterman, the Court held that where the shipowner in a similar manner had paid damages to an injured longshoreman, the longshoreman's stevedoring company employer was liable over to the shipowner even though there was no contract between the shipowner and the stevedoring company.

In Reed v. The Yaka, the longshoreman was allowed to sue the shipowner and to recover for unseaworthiness due to a defect in wooden pallets used in loading the ship, notwithstanding the same company that owned the ship was also the stevedoring company that hired the longshoreman.[5]

And finally, in Italia Soc. v. Ore. Stevedoring Co., the Court held that the stevedoring company was liable over to the shipowner for the unseaworthiness of the ship created by the stevedoring company, even though no negligence on the part of the stevedoring company was shown. It was in that case that the Court used the language we have quoted above describing the shipowner's liability to longshoremen for unseaworthiness in the type of cases we have here been discussing. The Court there also expounded the rationale of this whole series of cases as follows: (376 U.S. p. 324, 84 S.Ct. p. 754) "Where the shipowner is liable to the employees of the stevedoring company as well as its employees for failing to supply a vessel and equipment free of defects, regardless of negligence, we do not think it unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of injury-producing defective equipment supplied by a stevedore in furtherance of its contractual obligations. * * * [W]e deal here with * * * an area where rather special rules governing the obligations and liability of shipowners prevail, rules that are designed to minimize the hazards encountered by seamen, to compensate seamen for the accidents that inevitably occur, and to minimize the likelihood of such accidents. By placing the burden ultimately on the company whose default caused the injury, Reed v. The Yaka, 373 U.S. 410, 414, 83 S.Ct. 1349, 1352–1353, 10 L.Ed.2d 448, we think our decision today is in furtherance of these objectives." These objectives were stated in footnote 10, page 323 of that opinion, 84 S.Ct. at page 753, by quoting from DeGioia v. United States Lines, 2d Cir., 304 F.2d 421, 426, as follows: "The function of the doctrine of unseaworthiness and the corollary doctrine of indemnification is allocation of the losses caused by shipboard injuries to the enterprise, and within the several segments of the enterprise, to the institution or institutions best able to minimize the particular risk involved."

A consideration of the facts of this case in the light of the decisions here referred to leads inevitably to the conclusion that the district court's decision concerning seaworthiness was incorrect. Unloading sugar from the respondent's ship was ship's work. The longshoreman Huff was engaged in doing that ship's work when he was assisting in unloading this cargo. If the injuries were caused by some malfunctioning or defect in the unloading device or if there was improper use of the equipment by the other longshoremen, Blassingill v. Waterman S.S. Corporation, 9 Cir., Sep-

5. The argument was that the company should not be liable in damages because it was the longshoreman's employer, and the Longshoremen's and Harbor Workmen's Compensation Act provided that compensation liability of an employer under that Act was exclusive and in the place of any other liability on the part of the employer.

tember 9, 1964, 336 F.2d 367, Thompson v. Calmar S.S. Corp., 3 Cir., 331 F.2d 657, then appellant's claim would come squarely within the doctrine of the Sieracki case and the other cases which have followed it and amplified its principles. Under all of these Supreme Court decisions it is plain that the fact that the stevedoring company brought this unloading device to or into the ship in no manner lessens the shipowner's absolute obligation of seaworthiness which extends to the loading or unloading equipment furnished by the stevedoring company.

In our view the trial court went astray in holding, as we have noted above, that "the longshoreman was *not* incurring the hazards of a seaman, in that none of the traditional unloading gear of the ship, namely, winches, mast, or booms was being used in the operation in which he was engaged." The holding that the use of a newly invented, non-traditional unloading device such as the gantry crane here employed would operate to relieve the shipowner of the obligation of unseaworthiness, declared and enforced in the other cases which we have here cited, clearly is erroneous.

In reaching its decision the court relied upon the case of McKnight v. N. M. Paterson & Sons Ltd., D.C., 181 F. Supp. 434, which was affirmed by the Court of Appeals for the Sixth Circuit at 286 F.2d 250, by reference to the district court's opinion. In that case a longshoreman standing in the hold of a ship was injured when unloading equipment being loaded into the hold by a shore-based crane struck him because of a defect in the crane. In holding the shipowner not liable in that case the district court reached for grounds never mentioned or suggested in any of the decisions of the Supreme Court. Undertaking to distinguish the case from Petterson, Sieracki and other cases, the district court noted two things. It said,

"In the instant situation it cannot be seriously contended that the crane used in the unloading operation is equipment commonly found among the ship's gear. Both its size and sole function rebel against any argument that a ship might 'adopt' or 'integrate' such equipment as part of its gear." The other distinguishing feature relied upon was mentioned as follows: "The crane never became physically attached to the ship in any manner, nor did it at any time during the unloading process touch any part of the vessel." It was the former aspect of the district court's opinion to which the Court of Appeals, in affirming, particularly alluded, saying: "[A]lthough appellant, when injured, might have been doing the traditional work of a seaman, he was not incurring the hazards of a seaman, in that none of the traditional unloading gear of the ship, namely winches, masts, or booms, was being used in the operation in which he was engaged." The court in our case evidently had in mind the same distinction because it referred in its opinion to the fact that "none of the traditional unloading gear of the ship" was being used in the operation in which the longshoreman was engaged.[6]

When the Court of Appeals in McKnight stated of the longshoreman "he was not incurring the hazards of a seaman" because the gear was not the traditional unloading gear, it was drawing a distinction which is invalid. In Sieracki, the Court, after noting in language previously quoted that historically the work of loading and unloading is the work of the ship's service, said: "That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection." (328 U.S. at p. 96, 66 S.Ct. at p. 878.) In like manner it seems to us that the well established rule that the shipowner is absolutely

---

6. Two district court decisions have embraced the doctrine of McKnight v. N. M. Paterson and Sons, Ltd., supra. Both are decisions of the court for the Eastern District of Louisiana, Sherbin v. S. G. Embiricos Ltd., 200 F.Supp. 874, and Deffes v. Federal Barge Lines, Inc., 229 F.Supp. 719.

liable for the results of defects in unloading equipment brought on board ship by the stevedoring company should not be qualified or modified if the unloading equipment thus used happens to be newly designed and devised and involves none of the traditional unloading gear of the ship. Use of more modern equipment can no more exculpate the shipowner from his obligations than could use of "more modern divisions of labor."

It would seem passing strange if the shipowner, whose obligation of seaworthiness, as stated in Sieracki, "is peculiarly and exclusively the obligation of the owner. It is one he cannot delegate", could in effect delegate and avoid his obligation by employing a stevedoring company which used newly invented unloading devices.

In this case the injuries resulted from an improper functioning of the scraper, which is used to drag the sugar from the sides of the hold to a pile where it may be picked up by the scoops and elevated. A shovel could be said to be a traditional device for performing that function; and in the 18th century when bulk cargoes were being carried, shovels or something of similar character were unquestionably used by those unloading the ship for this purpose.[7]

We think it is a truism that modern sophisticated mechanical devices may well involve even more hazards than the ancient and more traditional ones. The hazards here were certainly those of the loading and unloading process; and

for this appellant the work involved was probably more hazardous than if the "scraping" was done with shovels or some other "traditional" device involving "traditional hazards." [8]

In Rodriguez v. Coastal Ship Corporation, D.C., 210 F.Supp. 38, Judge Weinfeld effectively answered and dispelled an argument similar to that which was used as a basis for the decision in the McKnight case. In that case a longshoreman was injured when he slipped on a pool of oil. The oil came from the motor of a gantry crane mounted on the deck of the ship, an experimental vessel, the first of its kind, which was designed to achieve maximum efficiency in the loading and unloading of trailer bodies. On behalf of the shipowner it was argued that this, a reconstructed vessel, an innovation of seacoast transportation, was *sui generis* and still in the experimental stage; that an inevitable consequence of its functioning was spillage of oil; and that, since seaworthiness is a "relative concept," under the circumstances the vessel was reasonably fit for its intended service. Judge Weinfeld said of this: "In this connection they boldly urge that 'questions of negligence and unseaworthiness with respect to the S.S. Gateway City and her operations cannot be judged by standards applicable to ordinary dry cargo ships.' This position suggests that the increased efficiency of the vessel through the construction of the gantry cranes, but with its still unresolved problem of constant oil spillage, is at the expense of the safety of the crew and

7. The term "bulk" finds its origin in Scandinavia and its use to refer to "cargo" was first recorded in 1575.

To load a ship in bulk is to put a cargo in loose when it consists of wheat, salt or the like. First recorded in 1727. Oxford English Dictionary. Even today, shovels are used to handle bulk cargoes under certain circumstances and the Fifth Circuit has recently held that the shipowner is responsible for the seaworthiness of shovels supplied to longshoremen by a stevedore for the purpose of loading a bulk cargo. McQuiston v. Freighters & Tankers S.S. Co., 327 F.2d 746. The longshoreman in that case

was not allowed to recover because the shovel was found to be seaworthy.

8. In footnote 3 in Italia Soc. v. Ore. Stevedoring, supra, where the Court was summarizing the general rules relating to the shipowner's liability for unseaworthiness, the Court said (p. 317 of 376 U.S. 84 S.Ct. at p. 750.) "If the owner engages others who supplied the equipment necessary for stevedoring operations, he must still answer to the longshoreman if the gear proves to be unseaworthy." There is no suggestion here that the gear referred to must be limited by a requirement that it must be "traditional ship's gear."

others engaged in seaman's work, and of their right to a reasonably safe place to work. The plea, in effect, amounts to a negation of the 'humanitarian policy' underlying the seaworthiness doctrine and if accepted would revive the now discarded concept of assumption of risk. This Court is unaware of any current authority or doctrine in general maritime law which shifts to the worker the burden of the hazards created by the shipowner's endeavors, experimental or otherwise, to increase the productive earning power of his vessel, thereby relieving the shipowner of his absolute duty to supply and maintain a seaworthy vessel and appurtenances. Indeed, to the contrary, the policy has been to assess the cost of the hazards of marine service, 'insofar as it is measurable in money,' upon the shipowner and not the worker, since he ' * * * is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its costs.' The cost of experimental activities and improvement programs to the extent they create dangerous working conditions must be borne by the shipowner and not the seaman." (pp. 42–43)

The sound principles there expounded are precisely applicable in the case before us. Here, as in that case, we say, using the words of Judge Weinfeld: "[T]he policy has been to assess the cost of the hazards of marine service, 'insofar as it is measurable in money,' upon the shipowner and not the worker, since he ' * * * is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its costs.' The cost of experimental activities and improvement programs to the extent they create dangerous working conditions must be borne by the shipowner and not the seaman."

Our attention has also been called to the case of Forkin v. Furness Withy & Co., 2d Cir., 323 F.2d 638, in which a divided court held the shipowner not liable to a longshoreman who received injuries due to the failure of a rope which was being used to move a conveyor toward the ship from its position on the pier. The stevedore foreman had ordered a crane operator to move the conveyor, which was to be used in loading the ship, toward the ship by hooking on to a rope fastened to the outer end of the conveyor. The injured longshoreman was at the end of the conveyor nearest the ship and preparing to attach it to cleats on the ship. When it was found that the conveyor was positioned too low for this fastening the foreman ordered the crane to lift it. The rope snapped and the conveyor fell injuring the longshoreman.[9] The court held that the shipowner's obligation of seaworthiness did not extend to the equipment involved, seemingly because the conveyor had not come in contact with the ship. It continued: "It may well be that once the conveyor was affixed to the ship, a seaman, or a stevedore engaged in unloading or loading, would have been entitled to recover on the ground of unseaworthiness if injured as a result of the conveyor's not being reasonably fit for its intended use, * * * but in such a case the conveyor would have become 'appurtenant' to the ship in the significant sense that it would have been within the shipowner's power of inspection whereas here it had not yet reached that status." (323 F.2d 641.)

We note from the portion of that opinion quoted above that what is there said would constitute a basis for distinguishing the Forkin case from this one. For here the scraper device had been affixed to the ship [10] and was operat-

9. The statement of the facts in Forkin seems to show that the accident was caused by a defect in the rope or in the use of the rope, yet the court's opinion treats it as being caused by a defect in

the conveyor. In discussing the case we assume a conveyor defect.

10. The stipulation here recites that the falls attached to the scrapers "are run through blocks which are attached to the

ing in the hold and it would have been within the shipowner's power of inspection. We do not care to perpetuate any such distinction. We base our refusal to treat the Forkin case as an authority upon the broader ground that the basic theory there applied is manifestly wrong and contrary to the controlling decisions, as noted in the dissenting opinion in that case.

The suggested concept of liability being predicated upon the shipowner's power of inspection has been rejected repeatedly. In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, the Court stated: "[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability." In accord, and contrary to the distinction suggested in the Forkin case, supra, are the following: Grillea v. United States, 2nd Cir., 232 F.2d 919, 923; Ballwanz v. Isthmian Lines, Inc., 4 Cir., 319 F.2d 457; [11] Thompson v. Calmar S.S. Corp., 3d Cir., 331 F.2d 657; Lahde v. Soc. Armadora del Norte, 9 Cir., 220 F.2d 357; Beeler v. Alaska Aggregate Corp., 9 Cir., 336 F.2d 108; Blassingill v. Waterman Steamship Corporation, 9 Cir., 336 F.2d 367.[12]

sides of the hold solely for the sake of convenience." We do not quite understand the purpose of this wording. No doubt an ordinary door is attached to an opening by hinges "for the sake of convenience." The facts appear to be that the blocks were so attached, and why they were attached is immaterial.

Because the blocks were attached the facts here differ from those in McKnight.

11. Said the Court (319 F.2d p. 461): "Thus the obligation of seaworthiness is absolute in character and is not satisfied by the exercise of reasonable care on the part of the shipowner, nor is it affected by relinquishment of control to another, such as a stevedore employer of a longshoreman. * * * Should the jury find unseaworthiness the maritime law would make the defendant liable for any injuries suffered by the plaintiff in this case by reason of the unsafe condition of the loading gear, including the unattached and unsecured wooden spreader, even if the ship owner had no knowledge of the defect and no opportunity to discover it or correct it."

12. It seems apparent that the departure of McKnight and Forkin from the settled principles of the cases decided by the Supreme Court, by writing into their decisions exceptions neither found nor suggested in any Supreme Court case, is due to the rejection by the opinions in McKnight and Forkin of the rationale of Sieracki and of the cases which have flowed from it.

This is made apparent from these two opinions themselves. In Forkin the opinion (323 F.2d pp. 640–641) referring to the rationale of Sieracki, indicates doubt as to Sieracki's premise that the work of loading and unloading was "performed until recent times by members of the crew", noting that this has been challenged in certain law review articles (including one written by losing counsel in Sieracki and Rogers) and noting also that "the stevedore has a long lineage, reaching back to ancient times." The opinion there noted that "for us, of course, the historical premises of Sieracki stands," yet "it takes some imagination" to suppose that the work involved in Forkin was generally done by a ship's crew.

After thus plainly indicating that in the majority's opinion Sieracki was based on most doubtful premises, it was but natural that the opinion would reach for and find some excuse for developing an exception to the Sieracki rule. In this connection, compare the dissents in Shenker v. United States, 2 Cir., 322 F.2d 622 at 631, and Walters v. Moore McCormick Lines, 309 F.2d 191 at 197, with their references to "dubious historical basis" and to the "need for Congress' accomplishing the revision of the law in this area that is so long overdue."

In the McKnight opinion on which the decision here is based, the trial judge, after noting the Petterson case, proceeded to emphasize the later (and presumably controlling) decision in Fredericks v. American Export Lines, 2 Cir., 227 F.2d 450, on which the court seemed to base its decision. A reading of that case shows it is wholly irrelevant to the question presented in McKnight. In that case American Export Lines was not sued as owner of any ship. There is nothing in the opinion to show who owned the ship being unloaded. As the court said: "No vessel was connected with the accident." The defendant was sued only as "lessee in possession of the pier." Claim of liability was based upon a New York

We reject what we regard as the ill-advised attempts as exemplified in the McKnight and the Forkin cases to attach unwarranted exceptions to the rules heretofore applied by the Supreme Court in this field. As stated by the Fourth Circuit in Scott v. Isbrandtsen, 327 F. 2d 113, 124 (1964): "The obvious trend of the Supreme Court decisions is toward providing ever increasing protection for crewmen, longshoremen and even others employed by independent contractors who may be called upon to work aboard vessels." This trend can be noted by examining numerous recent cases,[13] and we do not choose to challenge that trend in this decision.

We hold that the judgment must be reversed and the cause remanded for further proceedings in the trial court in accordance with the stipulation upon which the case was heard. Our decision thus amounts to a holding that if there was unseaworthiness which attended the scraper, the shipowner is liable for the appellant's damages received in consequence thereof.

We note that the stipulation does not set forth the precise cause of the scraper having moved and hit the libelant. Libelant was in the process of obtaining slack on the fall so that he could pull it to the scraper. It is not stated whether the scraper started moving toward the libelant because of some defect in the control device or whether the moving of the scraper was due to the failure of the operator of the button box to shut off the motor in accordance with instructions attached to the box. Upon remand the trial court will be in a position to receive evidence and make findings in respect to these matters. If the fault resulted not from a defect in the scraper or its control mechanism but from an improper use by the other longshoremen of the control equipment, then the trial court may have to consider whether the facts show circumstances similar to those presented in Blassingill v. Waterman Steamship Corporation, supra, or in Thompson v. Calmar S.S. Corp., supra, or in Beeler v. Alaska Aggregate Corp., supra.[14]

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

BARNES, Circuit Judge (concurring and dissenting):

I concur in reversing the district court. But I cannot agree with all the reasoning or factual conclusions contained in the majority opinion.

It was stipulated that this longshoring operation of unloading sugar involved the use of cranes "never found on ships as a regular part of ship's gear." In fact, they are land based. A leg, an integral part of the crane, is inserted

---

statute. Holding that the skid which fell, causing the injuries, was not a "part of American's plant or premises," and citing New York decisions, the court held the cited statutes not applicable. The court then concluded that liability of a pier owner would not extend to a defective appliance furnished on defendant's pier by a subcontractor.

The apparent misreading of the Fredericks decision would seem to explain why the court went astray in McKnight.

13. See for example Lawlor v. Socony Vaccuum Oil Co., 2d Cir., 275 F.2d 599, 84 A.L.R.2d 613; Roper v. United States, 4 Cir., 282 F.2d 413, (dissenting opinion, the judgment was affirmed, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1, on grounds not related to the present issue); DeVan v. Pennsylvania R.R. Co., 167 F.Supp. 336 (E.D.Pa.1958); DiSalvo v. Cunard SS Co., 171 F.Supp. 813 (S.D.N.Y.1959); Considine v. Black Diamond SS Co., 163 F.Supp. 107, 109, (D.Mass.1958); DeMarco v. United States, 204 F.Supp. 290 (E.D.Pa.1962); Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185, 4 Cir., (1964). See also cases cited in footnote 4, supra.

14. As for the cases of Titus v. Santorini and Billeci v. United States cited in the dissenting opinion, we have not ignored them since the Blassingill case cites both of them and the Beeler case cites Billeci.

Under the Beeler rule the question to be decided is whether any such negligent act, if there was one, occurred "at the very moment of injury", or whether an interval comparable to the brief one in Beeler separated the negligent act and the injury.

in the ship's open hatch. Scrapers, component parts of the crane, are operated by means of falls rigged through blocks attached to the sides of the hold "solely for the sake of convenience," and aid in bringing the sugar cargo to the crane.

The district court held the injured longshoreman "was *not* incurring the hazards of a seaman, in that none of the traditional unloading gear of the ship, namely, winches, masts and booms, was being used in the operation in which he was engaged. The cause of the injury cannot be attributed to the vessel."

I agree with my brothers that where a gantry crane takes the place of a shovel, for example, in unloading operations, the mere fact that gantry cranes are not traditionally, or usually, or were not formerly, used to unload sugar, would not and should not be the deciding factor to rule it is not the equivalent of ship's gear.

The ship and its gear, as I see it, has been held to include that which in this day of automation and new procedures takes the place of what was formerly "ordinary and usual" ship's gear. The concept of what constitutes the ship's gear has been broadened to include many pieces of equipment which are not traditionally affixed to the ship proper. Expressive of this trend is the language (though not the holding) of the court in Sherbin v. S. G. Embiricos, Ltd., 200 F.Supp. 874, 877 (E.D.La.1962):

"By judicial determination over the years of what constitutes the 'hull, gear, stowage, appurtenant appliances and equipment' of a ship, the sphere of liability of the ship owner has been constantly enlarged by extending the doctrine of unseaworthiness to cover many items of equipment, even though such equipment may be owned by the stevedore and exclusively used by the longshoremen or stevedores in loading and unloading operations. See Alaska S.S. Company v. Petterson, 347 U. S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. U. S. Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Considine v. Black Diamond Steamship Company, D.C., 163 F.Supp. 107, 108.''

The cases cited above lend force to the statement made. In Petterson, the Supreme Court followed the circuit court opinion, 205 F.2d 478 (9th Cir. 1953), which expressly held the shipowner liable for injury caused by a defective block which (it was assumed) was brought aboard by the stevedoring company. Of course, a block used in unloading cargo is traditionally a part of ship's gear.

In Rogers, the Supreme Court reversed a circuit court decision denying liability of the shipowner. 205 F.2d 57 (3rd Cir. 1953). In that case, the alleged unseaworthy condition was not created by the ship. A defective "land fall runner" was owned, produced and fastened to the winch by the stevedore in charge of the unloading operation. The ship not only did not sanction the use of the runner but also had no knowledge of its existence. Yet the Supreme Court reversal inferentially holds the runner is an appurtenance. It is our assumption that "a land fall runner" is, if not a traditional part of ship's gear, useful in unloading cargo.

In Considine, the court applied the reasoning of Petterson and Rogers to a piece of equipment never considered part of a vessel—an allegedly defective chisel-truck, a hydraulically-operated-platformed-wheeled device for handling heavy bales, etc. The court rejected outright the position of the defendants "that the truck, not being substitute, or ship-type equipment, and not owned by the ship, is not subject to the absolute warranty of seaworthiness." The chisel truck was not, traditionally, a part of ship's gear, yet it took the place of loading and unloading equipment, and hence its use when defective, established unseaworthiness.

But whenever a vessel has been held accountable for its unseaworthiness there has been, even in the most recent decisions establishing liability, at least lip service paid to the requirement that "the ship or its gear" (or that which

takes the place of the ship's gear) was not "reasonably fit for the purpose for which it was intended." Cf.: Deffes v. Federal Barge Lines, Inc., 229 F.Supp. 719 (E.D.La.1964).

In Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), the following language appears, quoted with approval in Italia, supra (described in the majority opinion as "the most recent case discussing the present problem") :

> "What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness;
> *   *   *."

That issue of reasonable fitness was not determined in the district court because that court—in the opinion of this court—too narrowly circumscribed what could be considered "ship's gear." The district court distinguished between "the unloading device itself," and "ship's gear." This court holds, in today's world, they may be one and the same.

The district court has still to reach the fundamental question: whether that mechanical apparatus which was used in unloading was free from defects, and reasonably fit for its intended purpose.

This court should be hesitant to draw any inference of improper functioning, without findings of fact by the trial court. The cases cited in the majority opinion, Blassingill v. Waterman S. S. Corp., 336 F.2d 367 (9th Cir., decided September 9, 1964); and Thompson v. Calmar S. S. Corp., 331 F.2d 657 (3d Cir. 1964), are just two examples of court findings that defective gear or negligent acts made the ship unseaworthy. In Blassingill, the proximate cause of libellant's injuries was clearly the grossly negligent overloading of a sling load of burlap bales. And in Thompson, the improper loading cargo, using the ship's line and the ship's power was the un-

disputed cause of the longshoreman's injury. Cases not cited by the majority, however, show the need for a careful consideration of all possible causes of injury in the not-so-obvious fact setting before any inferences of unseaworthiness are drawn. In Titus v. Santorini, 258 F.2d 352 (9th Cir. 1958), a longshoreman was injured on the ship when the ship's gear, wire and rope guy, broke while taking cargo aboard. The court refused to find the shipowner liable *where it had no conclusive proof on the cause of the accident.* Among other possibilities, the court noted that the injury may have been caused solely by the negligent act of a fellow longshoreman for which the court would refuse to make a finding of unseaworthiness. Comparable reasoning was adopted again by this court in Billeci v. United States, 298 F.2d 703 (1962), in an action by a longshoreman for injuries received when a winch fell out of gear and became freewheeling, causing a hatch section to swing out and strike him. Again the injury resulted from the use of the ship's gear. But this court refused to make a finding of unseaworthiness where the injury was found to be the result of the negligence of a fellow longshoreman in failing to use safety devices while using the winch.

These two ninth circuit cases, while not dispositive of the unique fact situation at bar, are helpful in pointing out to the trial court the large realm of possible causes of Huff's injuries that must be considered before making a finding on the question of unseaworthiness. Citation to Blassingill and Thompson alone, without any reference to other cases, including some from our circuit, might tend to distort the relevant considerations for the trial court to have in mind in its determination of whether or not the shipowner is to be held liable for Huff's injuries.

Thus I cannot agree with the majority that there was any proof or inference in the stipulated facts of "an improper functioning of the scraper." That a stevedore was injured is no proof of an improper functioning, nor of any defect.

I cannot agree that the majority have factually envisioned all the possible events which could have proximately caused the accident. The entire question of unseaworthiness of the vessel, if any, remains open for determination by the trier of facts.